United States Court of Appeals,

Eleventh Circuit.

No. 96-6866.

Clifford BRISENTINE, Plaintiff-Appellant,

v.

STONE & WEBSTER ENGINEERING CORPORATION, Defendant-Appellee.

July 21, 1997.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-94-N-1623-NE), Edwin L. Nelson, Judge.

Before BIRCH and CARNES, Circuit Judges, and GODBOLD, Senior Circuit Judge.

CARNES, Circuit Judge:

Clifford Brisentine brought this lawsuit against Stone & Webster Engineering Corporation ("Stone & Webster") alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* The district court granted summary judgment in favor of Stone & Webster, holding that Brisentine's statutory claims were subject to compulsory arbitration pursuant to an arbitration clause in a collective bargaining agreement. We reverse, because we hold that in order to bar litigation of federal statutory claims, a mandatory arbitration clause agreement must meet three requirements, none of which were met in this case.

## I. BACKGROUND

### A. THE COLLECTIVE BARGAINING AGREEMENT

The Project Maintenance and Modifications Agreement ("the Agreement") for the Tennessee Valley Authority ("TVA") is a collective bargaining agreement between TVA contractors and subcontractors and the unions comprising the Tennessee Valley Trades and Labor Council ("the Council"). The Council comprises some sixteen international unions, including the International Brotherhood of Electrical Workers ("IBEW"). Stone & Webster, a TVA contractor, is an employer party to that collective bargaining agreement.

Article I of the Agreement sets forth the intents and purposes of the parties, stating that the Agreement

shall be construed as binding upon and effective in determining the relations between the parties ... and [shall] set forth herein the basic Agreement covering the rates of pay, hours of work, and conditions of employment to be observed by the parties hereto.

In Article III of the Agreement, the contractor, Stone & Webster in this case, agrees to "recognize[ ] the Council as the sole and exclusive bargaining representative for all craft employees of the Contractor." Article IV, the only provision in the Agreement remotely addressing federal statutory rights, states:

The Council Unions and the Contractor shall not discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, age, or handicap....

Article VII provides a grievance procedure through which an employee may "protest a termination, suspension, or violation of a specific provision of this Agreement." Although the individual employee must initiate the grievance procedure, if a settlement is not reached within the first few steps of the grievance procedure, only the Council and the contractor have the authority to appeal an unfavorable resolution of a grievance to an arbitrator. *See* Agreement, Art. VII, Step III, 2 ("In the event agreement in not reached within ten (10) working days of receipt, the Contractor or the Council may appeal within ten (10) working days to the Arbitrator...."). Thus, neither the individual employee nor the employee's individual union can ensure that the employee's claim goes to arbitration. Notwithstanding that, it is the employee's individual union, not the employee or the Council, which shares the cost of arbitration with the contractor. *See* Agreement, Art. VII, Step IV, 2 ("In arbitration proceedings, the expenses of arbitration shall be shared by the Contractor and the Council Union involved.").

Once a grievance reaches arbitration, "[a]ll decisions of the arbitrator shall be within the scope and terms of this Agreement." The arbitrator's jurisdiction and authority are limited to determining the "meaning, application of, or compliance with the provisions of [the] Agreement." The arbitrator does not have jurisdiction or authority "to add to or detract from or alter in any way" any provision of the Agreement.

## B. THE HISTORICAL AND PROCEDURAL FACTS

Clifford Brisentine worked as an electrician in various small commercial, residential, and

industrial settings for more than ten years. In 1992, he fell off a scaffold at work and injured his back. After surgery, he underwent a rehabilitation process called "work hardening" to facilitate his return to work. In November 1993, Brisentine's doctor released him to return to work, but restricted him from lifting more than 30 to 45 pounds and from repetitive bending and stooping.

Getting on the payroll at Stone & Webster at TVA's Browns Ferry Nuclear Plant is a two part process. The first step requires that a union refer an individual for an opening at Stone & Webster. Once referred by the union, the individual becomes a "probationary employee." Such designation pulls the individual under the umbrella of the Agreement and provides him with all rights and liabilities appertaining thereunto. The second step requires that the individual "meet [the] requirements for ... clearance." *See* Agreement, Art. III, K. That is, the individual must file a formal application with Stone & Webster and meet the job specifications in order for Stone & Webster to formally hire the individual and put him on the payroll. Although an individual whose application is rejected is "not hired," under the technical terms of the Agreement, that individual is "terminated" from employment with Stone & Webster, because he is considered a probationary employee.

In early May 1994, Brisentine's union, the IBEW, referred him for an industrial electrician position with Stone & Webster at TVA's Browns Ferry Nuclear Plant. When Brisentine filed his application with Stone & Webster, he indicated that he was unable to engage in heavy lifting or repetitive bending and stooping. Shortly after that, Brisentine was informed that his application was rejected and he was terminated because of those disabilities. Tom Dougherty, a labor relations manager at Stone & Webster, reaffirmed to Brisentine later that day that he was terminated because of his disabilities. Brisentine told Dougherty that he believed he could do the job, because he had recently worked as an electrician at another nuclear power plant. Dougherty refused to reconsider his decision and explained that "he just couldn't take the chance of [Brisentine's] getting hurt on [the] job."

Immediately following his termination, Brisentine contacted an IBEW union representative about filing a grievance under the procedures set out in the Agreement. The IBEW representative told Brisentine that, because his dispute with the S & W centered around his disability, he would be

better off filing a complaint with the Equal Employment Opportunity Commission ("EEOC") instead of pursuing his claim through the grievance procedure. Brisentine took that advice; he filed a complaint with the EEOC; and he never filed a grievance.

After receiving his right to sue letter from the EEOC, Brisentine filed this lawsuit. In his complaint, Brisentine alleged that Stone & Webster had violated the ADA, 42 U.S.C. § 12101 *et seq.,* by terminating him because of his disability and failing to make a reasonable accommodation for it. Stone & Webster sought summary judgment on a number of grounds. However, the district court addressed only Brisentine's alleged failure to file a grievance pursuant to the procedures set forth under the Agreement and then submit that grievance to binding arbitration. Because he had failed to do so, the court dismissed actions.

## II. THE STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo,* applying the same standards as the district court. *See Counts v. American Gen. Life & Acc. Ins.,* 111 F.3d 105, 107 (11th Cir.1997); *Harris v. Board of Educ.,* 105 F.3d 591, 595 (11th Cir.1997). Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Counts,* 111 F.3d at 107.

## III. DISCUSSION

We deal here with the intersection of federal statutory anti-discrimination rights with mandatory grievance and arbitration clauses in a collective bargaining agreement. This area of the law has been staked out by two Supreme Court decisions, although neither one is directly on point to our case. Moreover, those two Supreme Court decisions reached different results. Our task then is to examine the precedential orbit of the two decisions and decide which one this case falls within.

The first Supreme Court decision bearing upon the matter is *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). In that case, an employee grieved and arbitrated unsuccessfully his claim that his discharge was racially discriminatory. After completing the grievance and arbitration process that the collective bargaining agreement mandated, he filed a

Title VII lawsuit. *Id.* at 43, 94 S.Ct. at 1017. A unanimous Supreme Court held that the mandatory grievance and arbitration clause, and the result of that process in that case, did not preclude the Title VII lawsuit. The Court explained that "the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII." *Id.* at 59-60, 94 S.Ct. at 1025.

The *Alexander* Court distinguished an employee's individual statutory rights from any contractual rights he may have as an employee under a collective bargaining agreement:

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.

*Id.* at 49-50, 94 S.Ct. at 1020. In reaching that conclusion, the Supreme Court determined that in enacting Title VII, Congress endowed individual employees with a statutory right to equal employment opportunities that is not susceptible to prospective waiver by the "majoritarian processes" of collective bargaining. *Id.* at 51-52, 94 S.Ct. at 1021.

Although *Alexander* involved a claim arising under Title VII, later cases indicate that the reasoning of that decision applies equally to claims brought under other federal statutes that protect individual rights. *See McDonald v. City of West Branch,* 466 U.S. 284, 290, 104 S.Ct. 1799, 1803, 80 L.Ed.2d 302 (1984) (applying *Alexander* in a 42 U.S.C. § 1983 lawsuit); *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 745, 101 S.Ct. 1437, 1447, 67 L.Ed.2d 641 (1981) (applying *Alexander* in a Fair Labor Standards Act lawsuit); *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 355 (7th Cir.1997) (applying *Alexander* in a lawsuit involving claims arising under the ADA and the Age Discrimination in Employment Act ("ADEA") as well as Title VII), *petition for cert. filed,* 65 U.S.L.W. 3783 (U.S. May 16, 1997) (No. 96-1830).

If Alexander were the last word on this subject from the Supreme Court, the law would be pretty clear, and Stone & Webster would have little to talk about. However, *Alexander* is not the

last word, and Stone & Webster does have something to talk about, because seventeen years after *Alexander* the Supreme Court decided *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In that case, as a condition of employment, the plaintiff had personally agreed to arbitration as his exclusive remedy for any controversy arising out of his employment or the termination of it. 500 U.S. at 23, 111 S.Ct. at 1650-51. He was later terminated. Believing it was because of his age, and notwithstanding his agreement to arbitrate any disputes the plaintiff filed a lawsuit alleging violation of the ADEA. The employer responded with a motion to compel arbitration. 500 U.S. at 24, 111 S.Ct. at 1651. In denying that motion, the district court relied upon *Alexander,* but the Supreme Court held that the motion to compel arbitration should have been granted.

The Supreme Court took back in *Gilmer* some of the disparaging things it had said about arbitration in *Alexander. See Gilmer,* 500 U.S. at 34 n. 5, 111 S.Ct. at 1656 n. 5. The Court also said in *Gilmer* that "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the [Federal Arbitration Act] FAA." 500 U.S. at 26, 111 S.Ct. at 1652. Accordingly, because the would-be plaintiff in that case had "made the bargain to arbitrate," the burden was on him "to show that Congress had intended to preclude a waiver of a judicial forum for ADEA claims." *Id.* (citation omitted). Having failed to carry that burden, he was relegated to his arbitration remedy. *See id.* 26-33, 111 S.Ct. at 1652-56.

Understandably, Stone & Webster contends that *Gilmer* means any agreement, including a collective bargaining agreement, that makes arbitration the exclusive remedy for violation of a federal statutory right is enforceable. The only exception in its view is where the plaintiff seeking to relitigate rather than arbitrate can show that Congress intended to preclude a waiver of a judicial forum in favor of arbitration. Stone & Webster points to the text of the ADA itself, which is arbitration friendly: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under this chapter." 42 U.S.C. § 12212. Encouragement is towards the other end of the pole from preclusion. Congress in the ADA did not manifest an intention to preclude a collective bargaining

waiver of a judicial remedy for an arbitration remedy. Therefore, Brisentine, like the plaintiff in *Gilmer,* should lose. Or so Stone & Webster argues.

The problem with Stone & Webster's argument is that it goes too far. If *Gilmer* stands for the proposition that any agreement requiring arbitration in lieu of judicial enforcement of federal statutory rights is valid, unless the plaintiff shows Congress intended to preclude the result, then *Gilmer* overruled *Alexander.* But the Supreme Court did not say in *Gilmer* that it was overruling *Alexander,* nor did the Court even imply that. Instead, the Court clearly implied to the contrary by explicitly distinguishing *Alexander* from *Gilmer. See* 500 U.S. at 33-35, 111 S.Ct. at 1656-57; *see also Livadas v. Bradshaw,* 512 U.S. 107, 126 n. 21, 114 S.Ct. 2068, 2080 n. 21, 129 L.Ed.2d 93 (1994) ("*Gilmer* emphasized its basic consistency with our unanimous decision in *Alexander* "; "*Gilmer* distinguished [*Alexander* ]."). Distinguishing a prior precedent that is being overruled would make as much sense as pruning a plant that is being dug up and discarded. If the Supreme Court in *Gilmer* had intended to cast *Alexander* upon the judicial mulch heap, it would not have bothered to prune back that decision.

In order to see which precedent the present case more closely resembles, we turn now to the distinctions the Supreme Court drew in *Gilmer* between that case and *Alexander.* There are three. First, the *Gilmer* Court distinguished *Alexander* because it had involved an agreement to arbitrate contractual claims that did not extend to statutory claims. *See Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1657. As the Court observed, the labor arbitrator's authority and power in *Alexander* were limited to interpretation of the collective bargaining agreement; the labor arbitrator was not authorized to resolve any statutory claims. For that reason, the agreement to arbitrate the contract claims under the collective bargaining agreement in *Alexander* could not preclude litigation of a statutory claim, which was outside its scope. *See id.* In *Gilmer,* by contrast, the agreement covered the arbitration of statutory as well as contractual claims. *See* 500 U.S. at 23, 111 S.Ct. at 1650-51, That made it, the Court noted, a "quite different issue." *Id.* at 35, 111 S.Ct. at 1657.

As in *Alexander,* in this case the arbitrator only has authority to interpret the collective bargaining agreement; the arbitrator does not have the authority to resolve statutory claims. *See*

Agreement, Art. VII, Step IV, 1; *Alexander,* 415 U.S. at 53, 94 S.Ct. at 1022.[1]

The provision in the collective bargaining agreement in this case that sets forth the arbitrator's authority to arbitrate claims brought pursuant to the grievance procedure is materially identical to the one in *Alexander.* Both agreements confine the arbitrator's jurisdiction to determining the meaning, application of, or compliance with the provisions of the agreement; both agreements make clear that the arbitrator does not have the authority to add to, detract from, or alter in any way any provision of the respective agreement. In examining the arbitrator's authority under the collective bargaining agreement in *Alexander,* the Supreme Court discussed the limitations it had previously placed on arbitrators of grievances brought pursuant to collective bargaining agreements, 415 U.S. at 53, 94 S.Ct. at 1022, and explained what those limitations meant in this context:

> If an arbitral decision is based solely upon the arbitrator's view of the requirements of enacted legislation, rather than on an interpretation of the collective-bargaining agreement, the arbitrator has exceeded the scope of the submission, and the award will not be enforced. Thus, the arbitrator has authority to resolve only questions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII.

415 U.S. at 53-54, 94 S.Ct. at 1022 (internal single quotations omitted). That analysis applies in this case, because the Agreement did not authorize the arbitrator to decide federal statutory claim issues.

It is true that Brisentine, unlike the plaintiff in *Alexander,* did not first submit any contract-based claims to arbitration. However, as the *Alexander* Court noted, "the actual submission

---

[1]*Alexander* explained the collective bargaining agreement at issue there as follows:

> Article 5, § 2, provided ... that "there shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry," and Article 23 § 6(a) stated that "[n]o employee will be discharged, suspended or given a written warning notice except for just cause." The agreement also contained a broad arbitration clause covering "differences aris[ing] between the Company and the Union as to the meaning and application of the provisions of this Agreement" and "any trouble aris[ing] in the plant." Disputes were to be submitted to a multistep grievance procedure, the first four steps of which involved negotiations between the company and the union. If the dispute remained unsolved, it was to be remitted to compulsory arbitration.... The agreement further provided that "[t]he arbitrator shall not amend, take away, add to, or change any of the provisions of this Agreement, and the arbitrator's decision must be based solely upon an interpretation of the provisions of the agreement."

*Alexander,* 415 U.S. at 39-42, 94 S.Ct. at 1015-16 (footnotes omitted).

of [the] grievance to arbitration ... does not alter the situation." 415 U.S. at 52, 94 S.Ct. at 1021; *see also id.* at 52, 94 S.Ct. at 1022 ("[Statutory and contractual rights] have legally independent origins and are equally available to the aggrieved party."); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1213 (8th Cir.1996) ("[T]he United States Supreme Court has held that the pursuit of a claim through grievance and binding arbitration under a [collective bargaining agreement] does not preclude a civil suit under Title VII, and we believe that the same reasoning applies to a plaintiff who has chosen not to participate in the grievance procedure.") (citations omitted), *cert. denied,* --- U.S. ----, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997). For all of those reasons, the first distinction the Supreme Court drew between *Alexander* and *Gilmer* places the present case on the *Alexander* side of the line.

So does the second distinction, which has to do with the individual versus collective nature of the agreements in the two cases. An individual contractual agreement to submit a claim to arbitration was enforced in *Gilmer;* a collective bargaining agreement to do so was not enforced in *Alexander.* The *Gilmer* Court noted that, in the context of collective bargaining agreements, employee-claimants are represented by their unions in arbitration proceedings. *See Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1657. As a result, there is a "potential disparity in interests between a union and an employee" regarding the prosecution of the employee's individual statutory rights. *Id.* That disparity weighed against the enforcement of arbitration clauses as the employee's exclusive remedy for individual statutory rights. *See Alexander,* 415 U.S. at 52, 94 S.Ct. at 1021-22; *see also Pryner,* 109 F.3d at 362-63. The *Gilmer* Court explained that the concern about the conflict between collective representation and individual statutory rights that was present in *Alexander* is not present in the context of individual employment contracts. *Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1657. Consequently, the Court was unconstrained by that concern when it determined in *Gilmer* that arbitration clauses in individual employment contracts are enforceable.

The same is true here. In fact, the disparity in interests between the union and the individual employee, which helps explain the differing results in *Alexander* and *Gilmer,* is illustrated by the facts in this case. Recall that the IBEW advised Brisentine to file a complaint with the EEOC rather

than file a grievance. That advice is some indication that the union was at least unenthusiastic, and perhaps unwilling, to pursue Brisentine's claim to arbitration. Recall also that, under the Agreement, the Council of Unions, not Brisentine or his union, would ultimately decide whether to put the claim to arbitration. *See* Agreement, Art. VII, Step III, 2. Moreover, the union, not Brisentine, would be obligated to bear half the cost of arbitration, which gave it an incentive against pressing the Council to take a claim to arbitration. That same conflict of interest existed in *Alexander* but was absent in *Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1657. Thus, the second distinction between those two cases, like the first distinction, places this case on the *Alexander* side of the line.

The third distinction the *Gilmer* Court drew between that case and *Alexander* was that the claim in *Gilmer* arose under the FAA, whereas the claim in *Alexander* did not. *Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1657. The FAA reflects a "liberal federal policy favoring arbitration agreements," which was another reason given for enforcing the arbitration clause in *Gilmer* but not *Alexander.* Neither this Court nor the Supreme Court has decided whether collective bargaining agreements are subject to the FAA. Other circuits that have addressed the issue have reached conflicting results. *Compare Pryner,* 109 F.3d at 359 (7th Cir.)(holding that the FAA is generally applicable to collective bargaining agreements) *with Austin v. Owens-Brockway Glass Container Inc.,* 78 F.3d 875, 879 (4th Cir.) (noting that "in this circuit, the FAA is not applicable to labor disputes arising from collective bargaining agreements") (citations omitted), *cert. denied,* --- U.S. ----, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). While *Gilmer* did reject *Alexander*'s general "mistrust of the arbitral process," *Gilmer,* 500 U.S. at 34 n. 5, 111 S.Ct. at 1656 n. 5, the Supreme Court has yet to address arbitration clauses in collective bargaining agreements in light of *Gilmer.* Unless and until it does so, the present case, a collective bargaining agreement case like *Alexander,* is not distinguishable from *Alexander* on that basis, either.

Therefore, in all three of the ways that the *Gilmer* Court distinguished that case from *Alexander,* this case is like *Alexander* and unlike *Gilmer.* It may be that the Supreme Court has cut *Alexander* back so far that it will not survive. Perhaps, but we are not convinced we are authorized to sing the dirge of *Alexander.* We will leave that to the Supreme Court, which has admonished

courts of appeal:

> If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Rodriguez de Quijas v. Shearson/American Express Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989); *accord Florida League of Prof. Lobbyists v. Meggs,* 87 F.3d 457, 462 (11th Cir.) ("This prediction may be accurate, but we are not at liberty to disregard binding case law that is so closely on point and has only been weakened, rather than directly overruled, by the Supreme Court."), *cert. denied,* --- U.S. ----, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996); *Pryner,* 109 F.3d at 364 ("[W]e are timid about declaring decisions by the Supreme Court overruled when the Court has not said so."). Unless and until the Supreme Court overrules *Alexander,* we are bound to apply that decision to a case like this one that involves an exclusive remedy arbitration clause in a collective bargaining agreement under which the arbitrator is limited to resolving contractual claims, and the employee-claimant is not empowered to insist that his claim be arbitrated.

In applying *Alexander* instead of *Gilmer* to collective bargaining agreements, we follow the Seventh, Eighth, and Tenth Circuits. *See Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1453 (10th Cir.1997) (adopting "the majority view ... that *Alexander* and its progeny remain good law and that statutory employment claims are independent of a collective bargaining agreement's grievance and arbitration procedures") (citations and internal quotation marks omitted); *Pryner,* 109 F.3d at 363 (7th Cir.) (applying *Alexander* and holding that "the union cannot consent for the employee by signing a collective bargaining agreement that consigns the enforcement of statutory rights to the union-controlled grievance and arbitration machinery created by the agreement"); *Varner,* 94 F.3d at 1213 (8th Cir.) (applying *Alexander* instead of *Gilmer* and holding that exhaustion of grievance and administrative remedies under a collective bargaining agreement is not required in order to bring a Title VII claim in federal court).

We disagree with the result and reasoning of the Fourth Circuit, which reached the opposite conclusion. *See Austin,* 78 F.3d at 885 (applying *Gilmer* and holding that an employee's individual statutory claim is subject to compulsory arbitration pursuant to an arbitration clause in a collective

bargaining agreement). Judge Hall dissented from that decision, and we find the reasoning in his dissenting opinion, *see id.* at 886-87, more persuasive that the panel majority's.

The Third Circuit recently has upheld the exclusivity of the arbitration remedy in a collective bargaining agreement case, but limited its holding to agreements which empower the employee to pursue arbitration without the approval of the union, and which explicitly provide for arbitration of statutory discrimination claims, instead of only contractual claims. *See Martin v. Dana Corp.,* 114 F.3d 421 (3d Cir. 1997). Even though it was circumscribed in that manner, the decision still drew a dissent. *Id.* at 421 (Scirica, J., dissenting). Unlike the agreement in *Martin,* the one in the present case did not give employees the authority to pursue arbitration without union consent, and the arbitrator was not given the authority to decide statutory claims, anyway.

## IV. CONCLUSION

Employment discrimination lawsuits are burgeoning as are the costs of litigating them, costs that are borne by the judicial system as well as by employers and employee-plaintiffs. Faced with a rising tide of litigation, it is not surprising that businesses are seeking to "trade[ ] the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration," *Gilmer,* 500 U.S. at 31, 111 S.Ct. at 1655 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)), in order to reduce the costs of resolving such disputes, nor is it surprising that courts are becoming more favorably inclined to litigation alternatives such as arbitration. The Supreme Court's attitude toward arbitration warmed considerably from *Alexander* to *Gilmer,* and may become warmer still. In the meantime, our duty is to apply the law as it is now.

Under that law, as we understand it, a mandatory arbitration clause does not bar litigation of a federal statutory claim, unless three requirements are met. First, the employee must have agreed individually to the contract containing the arbitration clause—the union having agreed for the employee during collective bargaining does not count. Second, the agreement must authorize the arbitrator to resolve federal statutory claims—it is not enough that the arbitrator can resolve contract claims, even if factual issues arising from those claims overlap with the statutory claim issues.

Third, the agreement must give the employee the right to insist on arbitration if the federal statutory claim is not resolved to his satisfaction in any grievance process. All three of those requirements were met in the *Gilmer* case, which is the latest word from the Supreme Court on the subject. None of the requirements were met in this case.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.