PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

--------------------

No. 97-6097

--------------------

D. C. Docket No. 95-N-2260-S

JIMMIE L. PETERSON;
ALONZO REESE,

                              Plaintiffs-Appellants,

                    versus

BMI Refractories,

                              Defendant-Appellee.

--------------------

Appeal from the United States District Court
for the Northern District of Alabama

--------------------

**(January 13, 1998)**

Before HATCHETT, Chief Judge, FAY and FARRIS*, Senior Circuit
Judges.


FAY, Senior Circuit Judge:

---
*Honorable Jerome Farris, Senior U.S. Circuit Judge for the Ninth
Circuit, sitting by designation.

Former employees Jimmie L. Peterson and Alonzo Reese brought this action in state court against employer B.M.I. Refractories, Inc.,("BMI"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1981, and alleging state law claims of breach of contract, assault, battery, and outrage. After the removal of the action to the District Court for the Northern District of Alabama, plaintiffs amended their complaint to delete the breach of contract claim. BMI moved for summary judgment on all remaining counts. The plaintiffs conceded that the Title VII claim was untimely, but opposed the summary judgment on the remaining claims. The district court granted summary judgment and held that plaintiffs' § 1981 claim and plaintiffs' state law tort claims were preempted by § 301 of the Labor Management Relations Act in that the claims were governed by a compulsory grievance and arbitration procedure of their collective bargaining agreement. We reverse and hold that the collective bargaining agreement at issue neither bars litigation of plaintiffs' § 1981 claim nor preempts plaintiffs' state law claims of assault, battery, and outrage.

## I. Background

### A.    The Historical Facts

In this appeal by plaintiffs of BMI's successful motion for summary judgment, we view the evidence in the light most favorable to the non-moving party. Counts v. American Gen. Life & Accident

2

Ins. Co., 111 F.3d 105, 108 (11th Cir. 1997). Plaintiffs Jimmie L. Peterson and Alonzo Reese are black males who were employed by BMI at its Birmingham, Alabama facility. Peterson worked as a laborer for BMI from 1990 or 1991[1] until his discharge on June 17, 1993. Reese was employed by BMI from 1987, 1988, or 1989[2] until his discharge on June 17, 1993. During their employment at BMI, both Reese and Peterson were members of the Laborers International Union of North America, AFL-CIO (the "Union"). The Union and BMI were parties to a collective bargaining agreement ("CBA"), and this CBA contained a grievance and arbitration procedure.

While employed by BMI, neither Reese nor Peterson ever received any sort of oral or written reprimand from their employer due to their job performance and neither individual was ever disciplined due to poor job performance. At BMI, plaintiffs were supervised by and reported to foreman Larry Chambliss. Chambliss, in turn, reported to Larry Giangrosso, who in turn reported to construction superintendent Bert Rolley.

In 1992, Reese was promoted to the position of labor foreman, a position requiring Reese to supervise other laborers and work alongside them. As a result of his promotion to foreman, Reese received a higher wage. Reese held this position for over a year.

---

[1]Peterson states in his affidavit that he began working for the defendant in 1990. In his deposition, Peterson states he was hired by the defendant in 1991.

[2]In his affidavit, Reese states that he worked for the defendant from 1987 to 1993. However, his deposition testimony indicates that Reese worked for the defendant for six to eight weeks in 1987, and returned to work for the defendant in 1988 or 1989, and stayed there for "around five years."

A white individual, Wayne Cookley, was also a foreman. Without notice or explanation, one day[3] Reese stopped receiving the wage of a foreman and his pay was reduced to that of a laborer. Wayne Cookley continued receiving a foreman's wage. Reese filed charges with the Equal Employment Opportunity Commission ("E.E.O.C.") as a result of this incident.

Reese alleges that as a result of his filing a charge with the E.E.O.C., BMI took steps to retaliate against him. Reese was required to work under the supervision of Wayne Cookley, formerly Reese's equal, and James Giangrosso. According to the affidavits and deposition testimony of Reese and Peterson, Giangrosso was a major source of racial hostility in their workplace.[4]

The racial hostility and discrimination at BMI was not limited to verbal abuse. Black employees were not given the same opportunities to advance as white employees were given, black employees were not given as many working hours as white employees were given, and black employees were forbidden from using the company trucks off of the premises while white employees were

---

[3]The record does not indicate the date the lower wage went into effect.

[4]In his affidavit, Reese asserts that Giangrosso asked Reese about the E.E.O.C. charge and told him he "went about it the wrong way"; and that Giangrosso also commented on several occasions that he "knew what [Reese's] problem is, you've been here too long." Reese and Peterson, in their affidavits, state that Giangrosso made racial taunts, often commenting to Reese when Reese was a labor foreman that "you think you white, don't you" and referring repeatedly to Reese and Peterson and other black employees as "nigger", "boy", and "you people". In his affidavit, Giangrosso denies the use of such language.

4

allowed to make use of such trucks.[5]

The racial hostility at BMI even reached the point of violence and physical intimidation. Peterson and Reese describe an incident where a black laborer, Willie Jordan, was kicked by Randy Mann, a white brick mason, and plaintiffs testify that everyone in the workplace knew of the attack and that BMI did nothing about it. On another occasion, Mann grabbed Peterson in the presence of Giangrosso and threatened to throw him off a fifty foot scaffold. Giangrosso's response, Peterson states in his affidavit, was to laugh.

The incidents of racial hostility at BMI came to a head on June 16, 1993, when Peterson and Reese were working the night shift from 7 p.m. to 7 a.m.. Peterson was working with a white man from Pittsburgh[6] while trying to cut bricks. Peterson had seen the man talking with Giangrosso earlier. The man from Pittsburgh and Peterson exchanged words.[7] After Reese and Peterson took their lunch break, they returned to their work stations. Peterson and Reese found that a pallet of gunnite bags had been overturned near

---

[5]Larry Chambliss, a labor foreman at B.M.I., stated in his affidavit that he was aware of the racially discriminatory atmosphere in the workplace.

[6]In his affidavit and in his deposition testimony, Peterson indicates he did not know this man's name. BMI disputes that this man from Pittsburgh even existed.

[7]Peterson asked the man to move his feet, which were in the way. The man from Pittsburgh called Peterson a "nigger" and told him that Peterson could not tell him what to do. Peterson told the man not to call him nigger and the man replied "Oh you goddamn nigger, you can't tell me what to do. I'm an expert in this here." Again, Peterson asked the man to move his feet and the man got up and left, saying "Goddamn you nigger boy."

where they had been working.  As Peterson bent over to pick up the bags, Peterson was kicked in the behind by Giangrosso.[8]  Peterson did not report the kick to Rolley, the construction superintendent, because Rolley was not at work that day.

Later that same shift, Reese and Peterson were heading to clock out when they were approached by Giangrosso.  Giangrosso was driving his truck[9] and another worker, Eddie Humphreys, was a passenger in the vehicle.  Giangrosso instructed Peterson to get in the cab of the truck with him and instructed several workers, including Reese, to climb in the back of the truck.  In his affidavit and in his deposition, Peterson states that Giangrosso pulled a nine millimeter pistol out of the glove box of the truck, pointed it in the general direction of Peterson, and said "You see this here, well I just want you to see it, that's all."[10]  When the truck stopped and Peterson and Reese got out, Giangrosso instructed them to return to the work site at 3:00 p.m.

When Reese and Peterson returned to the site at 3:00 p.m., Chambliss gave them their final paychecks and said they were being fired because Giangrosso told Rolley that the pair were no longer

---

[8]Peterson claims in his affidavit that he was kicked, causing his knees to buckle and causing him to fall to the ground. Giangrosso testified in his deposition that he merely tapped Peterson on the behind to get his attention.  Chambliss, who witnessed the incident, describes the contact as a "kick" in his affidavit.

[9]Giangrosso's personal truck has a rebel flag on the front of the vehicle where a license plate would go.

[10]Giangrosso pointedly denies threatening Peterson with a pistol.  He does admit keeping a nine millimeter pistol in his truck.

needed, and that they were fired because of the incidents that had occurred the night before.  The next day, Reese and Peterson went to the Union office to see about filing a grievance to get their jobs back.  Joe Black, Secretary/Treasurer of the local chapter of the Union, told them the Union would not get involved in the matter.

**B.    THE COLLECTIVE BARGAINING AGREEMENT**

The National Maintenance Agreement is the CBA between BMI and the Union.  Reese and Peterson, as employees of BMI and as members of the Union, are employees covered by the terms and conditions of this CBA.  Of particular applicability to the issues before this court are the provisions of Article III, ("Non-discrimination"), and Article VI, ("Grievances"), of the CBA.

Article III, the only provision of the CBA arguably addressing federal statutory rights, states:

> 1.   The Union and the Employer agree to abide by all Executive Orders and subsequent amendments thereto, regarding the Civil Rights Act of 1964, pertaining to non-discrimination in employment, in every respect.

Article VI of the CBA outlines the grievance and arbitration procedure which governs the resolution of work-related complaints by employees.  Paragraph 1 of Article VI of the CBA provides the deadlines for filing grievances, the deadlines for pursuing appeals of grievances, and allows for settlement of grievances at any step of the grievance procedure.  Paragraph 1 also explains each step of

7

the multi-step grievance procedure, with the final step being binding arbitration by the American Arbitration Association.[11] Once a grievance reaches arbitration, "the arbitrator shall only have jurisdiction and authority to interpret apply [sic] or determine compliance with the provisions of this Agreement."

## C. The Procedural Facts

As this court noted in its recent decision <u>Peterson v. BMI Refractories</u>, 124 F.3d 1386 (11th Cir. 1997), this case indeed has a "tortured history." Its procedural history is detailed at length in that opinion; therefore, we add only what is necessary for the resolution of this case. In light of the lengthy explanation of the procedural history of this lawsuit in that opinion, we will attempt to limit our explanation of the procedural history of this suit to only the most necessary of facts. The original complaint for this matter was filed in the Circuit Court of Jefferson County, Alabama, on February 2, 1995. Plaintiffs Peterson and Reese alleged race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1981, and state law claims of breach of contract, assault, battery, and outrage. The complaint was dismissed without prejudice on June 9, 1995, for failure to serve the defendant, BMI. The court clerk notified plaintiffs' counsel on June 23, 1995 that plaintiffs' case had been dismissed and on June 28, 1995,

---

[11]Arbitration by the American Arbitration Association only becomes available under the terms of the CBA if the National Maintenance Policy Committee, Inc., (step 4), fails to reach a decision on the grievance.

8

plaintiffs filed a motion to reinstate the case. This motion was granted by the state court on July 31, 1995. BMI was served on August 3, 1995. BMI removed the action to the U.S. District Court for the Northern District of Alabama on September 1, 1995. After removal, plaintiffs dropped their breach of contract claim. BMI moved for summary judgment on all counts. The magistrate judge assigned to the case issued a report and recommendation that BMI's motion for summary judgment be granted on all counts.[12]

The district court entered an order granting BMI's motion for summary judgment and dismissing the action in all respects "**WITHOUT PREJUDICE** to the right of any party to reopen the action following completion of the grievance and arbitration proceedings, should there remain any issues unresolved by arbitration" (emphasis in original). The district court accepted and adopted the recommendations of the magistrate judge with one exception -- the district court found that the plaintiffs' claims of assault and battery were also preempted by the grievance and arbitration procedure of the CBA. The plaintiffs filed a timely notice of appeal on January 30, 1997.

---

[12]The magistrate judge found the plaintiffs' Title VII claims were time-barred, and that the plaintiffs' § 1981 claims were preempted by the grievance and arbitration procedure of the CBA that existed between the plaintiffs' union and BMI. The magistrate judge also found that BMI could not be held liable for the torts of its supervisory employee because Giangrosso was not acting within the line and scope of his authority and his actions were not in furtherance of the business interests of BMI. On a separate motion for summary judgment, the magistrate judge found the plaintiffs' outrage claim was also preempted by the grievance and arbitration procedure of the CBA.

## II.  Standard of Review

We review the district court's grant or denial of a motion for summary judgment <u>de novo</u>, applying the same standards as the district court.  <u>Harris v. Bd. of Educ.of Atlanta</u>, 105 F.3d 591, 595 (11th Cir. 1997).  Summary judgment is appropriate if the pleadings, depositions and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  <u>Counts</u>, 111 F.3d at 108.

## III. Discussion

BMI first contends that this court does not have jurisdiction to hear this appeal.  BMI argues that the district court order dismissing plaintiffs' claims without prejudice was not a final order, since the district court left open the option of pursuing the claims through arbitration.  Second, BMI argues that even if jurisdiction is found to exist, the district court acted appropriately in finding that the plaintiffs' § 1981 race discrimination claim was preempted by the grievance and arbitration procedure of the CBA.  Third, BMI similarly contends that plaintiffs' state law claims of assault, battery and outrage depend upon an interpretation of the CBA and are thus preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Finally, BMI asserts numerous alternate grounds for upholding the district court's order.

Plaintiffs Peterson and Reese respond to BMI's contentions as follows.  First, they argue the district court's order was in all respects a final order and as such was immediately appealable to

10

this court.  Second, plaintiffs assert that this court's July 21, 1997 decision in Brisentine v. Stone & Webster Eng'g Corp., 117 F.3d 519 (11th Cir. 1997), compels a reversal of the district court's dismissal of plaintiffs' § 1981 race discrimination claim for failure to pursue the grievance and arbitration procedure of the CBA.  Third, plaintiffs argue that plaintiffs state law claims of assault, battery and outrage do not require an interpretation of the CBA, and as such these claims are not preempted by the CBA. Finally, plaintiffs dispute that BMI's alternative grounds for affirmance of the district court's order compel an affirmance by this court.

## A. Jurisdiction

BMI contends that this court does not have jurisdiction to hear this appeal because the district court has not entered a final order in this case.  Upon BMI's motion for summary judgment, the district court entered an order granting BMI's motion for summary judgment and dismissing the action in all respects **WITHOUT PREJUDICE** to the right of any party to reopen the action following completion of the grievance and arbitration proceedings, should there remain any issues unresolved by arbitration." (emphasis in original).  BMI argues the language of the district court order makes clear that this order is not a final order, but merely a transfer order referring the case to arbitration.  We disagree.

As plaintiffs have pointed out, in Kobleur v. Group Hospitalization and Med. Serv., Inc., 954 F.2d 705, 708 (11th Cir. 1992), we unequivocally held that a "district court's dismissal of

11

a case without prejudice for failure to exhaust administrative remedies is a final order, giving an appellate court jurisdiction under 28 U.S.C. § 1291." As in Kobleur, the practical effect of the district court's order here is to deny the plaintiffs judicial relief until they have exhausted their administrative remedies. The district court's order is even more "final" here and plaintiffs' argument is all the more compelling in that plaintiffs would be denied access to the grievance and arbitration procedure since the CBA requires that grievances be filed within ten days of the occurrence. Therefore, the district court entered a final order giving this court jurisdiction to hear the appeal under 28 U.S.C. § 1291.

**B. § 301 Preemption of Plaintiffs' § 1981 Claim**

In Brisentine, decided earlier this year, this court established a three part test to determine whether a mandatory grievance and arbitration procedure in an employment contract bars litigation of a federal statutory claim. Plaintiffs contend that this test, articulated after the district court's order dismissing plaintiffs' claims, requires a reversal of the district court's order dismissing the § 1981 claim. We agree.

42 U.S.C. § 1981 guarantees to all persons within the jurisdiction of the United States "a panoply of individual rights the primary one being the right to contract to earn a living." Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan, 518 F.Supp 993, 1008 (S.D. Tex. 1981). It is undisputed that to advance a § 1981 claim is to advance a federal statutory claim. Under the

12

law of this circuit, a mandatory arbitration clause does not bar litigation of a federal statutory claim unless certain requirements are met.  The threshold requirement is that "the employee must have agreed individually to the contract containing the arbitration clause -- the union having agreed for the employee during collective bargaining does not count." Brisentine, 117 F.3d at 526.  Since all elements of the    Brisentine test must be satisfied in order for an arbitration clause to preempt a federal statutory claim, we need not pursue our inquiry any further.[13]  The record makes evident that the contract at issue containing the arbitration clause was a CBA agreed upon by the Union but not by the individual employees.  For that reason, we must reverse the district court's dismissal of plaintiffs' § 1981 claim.

## C.  § 301 Preemption and Plaintiffs' State Law Claims

Plaintiffs also contend the district court erred in finding that their state law claims of assault, battery, and outrage were preempted by § 301(a) of the LMRA, which provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

---

[13]We reject the defendant's contention that § 1981 claims are somehow different from other federal statutory claims asserting individual rights that fall under the protective scope of Brisentine. Given that Title VII claims are covered by the Brisentine test, it would be incongruous for us to treat § 1981 claims differently since in the past we have held that the elements of a disparate treatment claim of employment discrimination under § 1981 and Title VII are identical. See Lincoln v. Bd. of Regents, 697 F.2d 928, 935 n.6 (11th Cir. 1983).

13

29 U.S.C. § 185(a).[14]   With regard to state tort claims, § 301 preemption requires this court to focus on whether the state tort claim "confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1985).  It is important to note that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301 or other provisions of the federal labor law."  Id. at 211.

In determining whether plaintiffs' state law tort claims require interpretation of the terms of the CBA, we must look to the elements of each challenged state law claim.  Lightning v. Roadway Express, Inc., 60 F.3d 1551, 1557 (11th Cir. 1995).

### 1. Plaintiffs Assault and Battery Claims

Under Alabama law, an assault consists of "an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." Allen v. Walker, 569 So.2d 350, 351 (Ala. 1990) (citations omitted).  A battery has been defined by the Alabama Supreme Court as follows:  "A successful assault

---

[14]For a more complete history regarding the development of the § 301 preemption doctrine, see Lightning v. Roadway Exp.,Inc., 60 F.3d 1551, 1556-1557 (11th Cir. 1995).

14

becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner . . . *to lay hands on another in a hostile manner is a battery, although no damage follows*." <u>Surrency v. Harbison</u>, 489 So.2d 1097, 1104 (1986)(emphasis in original)(citations omitted).

BMI contends that to determine whether BMI is liable for the assault and battery committed by BMI supervisor Giangrosso[15], a court would necessarily have to interpret the CBA in order to adjudicate the elements of each claim. This argument lacks merit. Resolution of plaintiffs' assault and battery claims involves a purely factual inquiry that does not turn on the meaning of any provision of the collective bargaining agreement. <u>See</u> <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399, 407 (1988). Plaintiffs' right to be free from assault and battery rests firmly on a nonnegotiable state right and does not turn on any interpretation of BMI's collective bargaining agreement. <u>See</u> <u>Hayden v. Reickerd</u>, 957 F.2d 1506, 1509 (9th Cir. 1992). Accordingly, we reverse the district court's order with regard to plaintiffs' assault and battery claims.

## 2. Plaintiffs' Outrage Claim

Under Alabama law, to present a jury question on the tort of outrage, or intentional infliction of emotional distress, "the

---

[15] Plaintiffs' assault claim arises from the incident in which Giangrosso threatened Peterson with a nine millimeter pistol while Peterson was a passenger in Giangrosso's truck on June 17, 1993. The battery claim is based on Giangrosso's kicking of Peterson on June 16, 1993.

15

plaintiff must present sufficient evidence that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1043 (Ala. 1993). BMI contends that a construction of the CBA is essential to the resolution of this claim, and as such, this claim is preempted. BMI argues that the determination as to whether the employers' actions were sufficiently outrageous to satisfy the second element of this tort  is dependent upon the employment context, and here the employment context is largely dependent on the CBA. Given the outrageous nature of the incidents at issue, BMI's argument is untenable.

An analysis of an employee's outrage or intentional infliction of emotional distress claim may very well require a court to construct and interpret an employment contract or CBA in order to properly ascertain the terms and conditions of that employee's employment. See Lightning, 60 F.3d at 1557. There are times, however, when "the extreme and outrageous character of certain sorts of employer conduct may be evident without reference to the terms of a collective bargaining agreement." Id. (citations omitted). The employer conduct here rises to such a level.

The facts here are markedly similar to facts before this court in Lightning, where the plaintiff was pursuing an intentional infliction of emotional distress claim against his employer under Georgia law. After outlining the physical and verbal abuse heaped

16

on the plaintiff by his employer, this court concluded that the plaintiff's claim "revolves around conduct by his employer that is not even arguably sanctioned by the labor contract."             Id. (citations omitted).  The same can be said for this case, where the abuse by BMI supervisor Giangrosso consisted of racial taunts, an assault with a pistol, and an incident where Giangrosso kicked Peterson from behind with force sufficient to bring Peterson to his knees.  Abuse of this sort cannot arguably be sanctioned by the terms of the CBA at issue, and as such a resolution of this tort claim does not implicate the provisions of the CBA. See id. Accordingly, we reverse the order of the district court with respect to plaintiffs' state law claim for outrage.

**D. BMI's Alternative Grounds in Support of Dismissal**

BMI raises seven alternative grounds in support of the district court's order granting summary judgment to BMI.  Of these seven grounds, we find that only the issue of the timeliness of plaintiffs' claims merits discussion.  While plaintiffs concede that their Title VII claims were untimely, BMI asserts that all of plaintiffs claims were untimely.  BMI points out that all of the claims raised by plaintiffs are subject to a two year statute of limitations,[16] and that the acts complained of by plaintiffs occurred on or before June 17, 1993.  BMI does not dispute that the plaintiffs filed a timely state court action on February 2, 1995,

---

[16]See  Ala. Code § 6-2-38(l) (1993) (personal injury actions not specifically enumerated have a limitations period of two years); see also Goodman v. Lukens Steel Co. , 482 U.S. 656, 661 (1987) (§ 1981 is governed by state personal injury statute of limitations).

17

well within the two year statute of limitations. Instead BMI argues that since the state court dismissed plaintiffs claims on June 9, 1995, and plaintiffs did not move to reinstate their claims until June 28, 1995, the plaintiff's claims were not filed within the two year statute of limitations. BMI characterizes the reinstatement of plaintiffs' case as being tantamount to the filing of a new lawsuit, and cites <u>Stinson v. Kaiser Gypsum Co.</u>, 972 F.2d 59 (3d Cir. 1992), for the proposition that such an action would be time barred.[17] While we do not disagree with the rule articulated in <u>Stinson</u>, we find fault with BMI's characterization of the reinstatement of plaintiffs' claim in state court as a "new" action.

After plaintiffs had their state court case dismissed for failure to serve the defendant, plaintiffs moved to have the case reinstated. The reinstatement of the original suit was not the commencement of the action, rather, the action was commenced with the timely filing of the state court suit. The dismissal by the state court was involuntary and without notice[18], and the plaintiffs promptly moved to reopen the suit. As such, the reinstatement by the state court was not the initiation of a new action, but rather the reopening of the original case. See <u>Ford v. Sharp</u>, 758 F.2d

---

[17]"If a timely filed action is dismissed after the limitations period measured from the accrual of the claim, has run, a new action on the same claim is time barred unless a limitations savings statute provides otherwise." <u>Stinson</u>, 972 F.2d at 62. Alabama has no such savings statute.

[18]Plaintiffs did receive notice of the dismissal on June 23, 1995, but BMI asserts the statute of limitations ran on June 17, 1995.

1018, 1024 (5th Cir. 1985). We hold, under these facts, that the reinstatement of plaintiffs' suit was not the initiation of a new action and that plaintiffs' § 1981 and state law tort claims were timely filed.

## IV. Conclusion

For the foregoing reasons, we VACATE the order granting summary judgment and dismissing the state law claims and REMAND the case for further proceedings consistent with this opinion. REVERSED and REMANDED.