Jose Louie VARGAS, Plaintiff,

v.

Gerald J. GROMKO, et al., Defendants.

No. C–96–20572 EAI.

United States District Court,
N.D. California,
San Jose Division.

Sept. 5, 1997.

James Moore King, Santa Cruz, CA, for Plaintiff.

J. Michael Hogan, Senior Deputy County Counsel, Office of the County Counsel, County of Monterey, Salinas, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

INFANTE, United States Magistrate Judge.

### I. INTRODUCTION

On July 7, 1997, Defendants Gerald J. Gromko and the County of Monterey ("the County") filed a motion for Summary judgment. Plaintiff opposed the motion. For the reasons set forth below, Defendants' motion is GRANTED.

### II. BACKGROUND

Plaintiff's First Amended Complaint (the "FAC") alleges that Plaintiff was discrimina-

1. The court understands Plaintiff's FAC to attempt to state claims under § 1983 for violation of his First and Fourteenth Amendment rights.

2. The court presumes that this claim is meant to attempt to stale a claim for termination in violation of public policy and/or directly under the California Constitution.

3. Defendants primarily rely upon the written arbitration decision on this motion rather than submitting to the court the evidence and record underlying that decision. An arbitration decision may be admitted as evidence and accorded such weight as the court deems appropriate. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 60

torily discharged on the basis of race, national origin and/or disability from his employment as a maintenance worker for the Monterey County Public Works Department ("the Public Works Department"). The FAC attempts to state claims against Defendants under (1) 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); (2) Cal. Gov't Code §§ 12900 *et seq.* (the "Fair Employment and Housing Act" or "FEHA"); (3) 42 U.S.C. § 1983 (" § 1983");[1] (4) 42 U.S.C. § 1981 ("§ 1981"); (5) 42 U.S.C. §§ 12101 *et seq.* (the "Americans with Disabilities Act" or "ADA"); and (6) the common and statutory law and the Constitution of the State of California (the "non-FEHA state law claims").[2] Defendants contend that Plaintiff was terminated because he threatened to kill his three supervisors at the Public Works Department—Ronald Lundquist, Don Collins and Ray Fultz.

Pursuant to a Memorandum of Understanding ("MOU") between the County and the Service Employees' Union, the employment dispute between Plaintiff and the County was submitted to arbitration. On November 14, 1996, the arbitrator issued a written decision containing findings of fact and concluding that Defendants' termination of Plaintiff was justified. *See* Declaration of William K. Rentz in Support of Defendants' Motion for Summary Judgment ("Rentz Declaration") at Ex. A. Plaintiff filed this action in federal court on July 15, 1996, prior to the arbitration.

The following facts, which Plaintiff does not appear to dispute, are contained in the arbitration decision, except where otherwise indicated:[3]

& n. 21, 94 S.Ct. 1011, 1025 & n. 21, 39 L.Ed.2d 147 (1974); *Corbin v. Pan American World Airways, Inc.,* 432 F.Supp. 939, 945 n. 5 (N.D.Cal. 1977). Factors for the court to consider in determining whether to admit an arbitration decision, and what weight to give the decision, include the degree of fairness in the arbitration forum, the adequacy of the record with respect to the issues of discrimination, and the special competence of the arbitrators. *See Gardner–Denver,* 415 U.S. at 60, n. 21, 94 S.Ct. at 1025, n. 21. Here the arbitrator's decision, as well as the Rentz Declaration, reflect that both Plaintiff and the County were given the opportunity to present evidence, examine and cross-examine witnesses, and make arguments at the arbitration, and that the pro-

Plaintiff was employed as a maintenance worker with the Public Works Department. *See* FAC ¶ 4. His employment was terminated by Defendants on December 15, 1995. See Arbitration Decision at 3. On October 20, 1995, Plaintiff, during a telephone conversation with Doctor Harrison, his doctor, stated as follows:

if I had a gun and these three individuals; [sic] Lundquist, Don Collins and Ray Fultz were in front of me, if I owned a gun for them discriminating against me and harassing me is what I said, I would have shot them.

*See* Declaration of J. Michael Hogan in Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Hogan Declaration") at Ex. A [excerpt of transcript of Plaintiff's July 24, 1997 deposition]. After speaking with Plaintiff, Dr. Harrison contacted the Greenfield Police Department and reported that Plaintiff had made threats against his supervisors. *See* Arbitration Decision at 6. Dr. Harrison further recommended that Plaintiff be taken to a mental health facility and placed on a 72–hour hold. *See id.*

In response to Dr. Harrison's report, Greenfield Police Officer Mike Shannon was dispatched to Plaintiff's residence. *See id.* Plaintiff told Officer Shannon that "he was going to, go quote, postal. Get a .09 millimeter, go to Monterey and kill someone." *See* Declaration of James Moore King in Opposition to Defendants' Motion for Summary Judgment ("King Declaration") at Ex. 1 at 29:18–19 [excerpt of transcript of arbitration testimony of Mike Shannon]; Arbitration Decision at 7. Although Plaintiff did not expressly reference his three supervisors in Officer Shannon's presence, Officer Shannon understood Plaintiff's statement to refer to Plaintiff's employers. *See* King Decl. at Ex. 1 at 29:21–22. Officer Shannon persuaded Plaintiff to go voluntarily to the mental health unit of Natividad Hospital. *See id.*

At the Natividad Mental Health Unit, a mental health crisis team evaluated Plaintiff and placed him on a 72–hour hold. *See* Arbitration Decision at 7. The team concluded that Plaintiff's threats were sufficiently credible to require warnings to potential victims in accordance with *Tarasoff v. Regents of the University of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). *See id.* Accordingly a letter was sent from the Department of Public Health to Public Works Director Ron Lundquist. Copies of the *Tarasoff* warning letter also were sent to Ray Fultz and Don Collins, as well as to the Greenfield Police Department. *See id.* Although the mental health crisis team recommended that Plaintiff remain at the Natividad facility for an additional 14 days, Plaintiff was released several days after the 72–hour hold expired after a hearing officer determined that there was no evidence that Plaintiff's behavior was the result of a mental disorder. *See id.*

On October 26, 1995, the County obtained a temporary restraining order in Monterey County Superior Court against Plaintiff barring Plaintiff from making any contact with any of the three supervisors or from entering Public Works Department premises. *See* Rentz Decl. at Ex. B [Restraining Order]. On December 15, 1995, Plaintiff was terminated from his employment with the Public Works Department. A termination letter sent to Plaintiff states that the discharge was "based on threats of physical violence" against his supervisors, and "continuing refusal or failure to observe the rules and regulations of the workplace." *See* Arbitration Decision at 3.

### III. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91

ceedings were transcribed by a reporter. In light of these procedural safeguards taken at the arbitration, and the fact that Plaintiff has not objected to admission of the arbitration decision, the court admits the arbitration decision as evidence on this motion.

L.Ed.2d 265 (1986). However, the moving party has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (quoting Rule 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Evidence that "is merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment. *Id.* at 249–250, 106 S.Ct. at 2511.

Summary judgment cannot be granted where a genuine dispute exists as to any material fact. Fed.R.Civ.P. 56(c). A "material" fact is one that might affect the outcome of the case under the applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non-moving party. *Id.* In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." *Id.*

4. Plaintiff argues only that his First Amendment claim is not susceptible to prospective waiver in

## IV. DISCUSSION

### A. PLAINTIFF'S FEDERAL STATUTORY CLAIMS ARE NOT PRECLUDED BY THE ARBITRATION DECISION

Defendants contend that Plaintiff's federal statutory causes of action are precluded by the arbitration in this matter, which, according to the terms of the MOU, is to be "final and binding." *See* Rentz Decl. at Ex. C at §§ 28.1 & 28.2 [excerpt from MOU]. Defendants argue that *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), in which the Supreme Court ruled that an employee's right to bring a Title VII action is not waived by inclusion of an arbitration clause in a collective bargaining agreement, has been overruled by *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Defendants rely on the Fourth Circuit's decision to this effect in *Austin v. Owens–Brockway Glass Container, Inc.* 78 F.3d 875 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996), a case arising under the Americans with Disabilities Act.

Although Plaintiff does not appear to challenge Defendants' argument that *Gilmer* overruled *Gardner–Denver,*[4] the court declines to adopt the Fourth Circuit's analysis of these two Supreme Court cases. In *Gilmer,* the Supreme Court held that an agreement in a securities registration application to arbitrate statutory claims is enforceable against an employee. The *Gilmer* Court therefore concluded that the plaintiff's claim under the Age Discrimination in Employment Act was subject to mandatory arbitration as provided for in the application, which formed part of the employment contract between the plaintiff and the defendant. Primarily relying on this holding in *Gilmer,* the Fourth Circuit concluded in *Austin* that:

> [w]hether the dispute arises under a contract of employment growing out of a securities registration application, a simple employment contract, or a collective bargaining agreement, [where a voluntary] agreement has ... been made to arbitrate

a collective bargaining agreement.

the dispute ..., it is valid, and we are of opinion [sic] it should be enforced.

*See* 78 F.3d at 885.

Although the Ninth Circuit has not yet addressed this issue, the Seventh, Eighth, Tenth and Eleventh Circuits, as well as district judges in the Northern District of California, all have disagreed with *Austin* and affirmed the vitality of *Gardner–Denver* in the collective bargaining context. *See Pryner v. Tractor Supply Company,* 109 F.3d 354, 360–365 (7th Cir.1997); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1213 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997); *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437 (10th Cir.1997); *Brisentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519 (11th Cir. 1997); *Buckley v. Gallo Sales Co.,* 949 F.Supp. 737, 742–743 (N.D.Cal.1996); *Foster v. Bechtel Corp.,* 1996 WL 784506, *4–*6 (N.D.Cal.1996); *see also Cole v. Burns International Security Services,* 105 F.3d 1465, 1478 (D.C.Cir.1997) (noting that "the Supreme Court saw a critical distinction in the situations raised by *Gardner–Denver* and *Gilmer* "); *cf. Livadas v. Bradshaw,* 512 U.S. 107, 128 n. 21, 114 S.Ct. 2068, 2080 n. 21, 129 L.Ed.2d 93 (noting that *Gilmer* is basically consistent with *Gardner–Denver* ); *Prudential Insur. Co. v. Lai,* 42 F.3d 1299, 1303 (9th Cir.1994) (noting that *Gilmer* did not overrule *Gardner–Denver* ), *cert. denied,* —— U.S. ——, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995). At present, the Fourth Circuit stands alone among the Circuit Courts of Appeal on this issue.[5]

This court declines to follow the Fourth Circuit's holding in *Austin.* While the *Gilmer* decision retreats from certain portions of *Gardner–Denver* regarding the reliability of the arbitral forum, it does not overrule *Gardner–Denver.* To the contrary, the *Gilmer* Court took pains to distinguish its holding from the *Gardner–Denver* decision on three grounds: that *Gardner–Denver* (1) in-

volved an agreement to arbitrate only contractual claims and did not extend to statutory claims; (2) involved a collective bargaining agreement, and, thus, was concerned with the conflict between collective representation and individual statutory rights; and (3) did not involve claims under the Federal Arbitration Act ("FAA"), which reflects a liberal federal policy in favor of arbitration. *See Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1656–1657.

The instant action clearly falls on the *Gardner–Denver* side of the fence set up in *Gilmer* for determining whether a federal statutory action is precluded by an agreement to arbitrate. First, the portions of the MOU submitted by Defendants state that the only matters subject to arbitration are (1) grievances "which directly concern or involve the interpretation and application of the specific terms and provisions of this Agreement" (*See* Rentz Decl. at Ex. C at § 28.1); and (2) appeals of disciplinary action (*Id.* at § 28.2). Although Defendants assert that these provisions represent an agreement to arbitrate all matters relating to discipline, including statutory issues, these provisions do not in any way reference federal statutory rights or even claims of discrimination. *Compare Austin,* 78 F.3d at 879–880 (collective bargaining agreement expressly stated that company would comply with all laws preventing discrimination, including the ADA, and expressly stated that any disputes regarding discrimination would be subject to the grievance/arbitration procedure). The MOU provisions relating to arbitration relate only to contractual rights under the collective bargaining agreement, and confer no authority on the arbitrator to resolve federal statutory claims of employment discrimination.

Second, the agreement to arbitrate is contained in a collective bargaining agreement— the MOU. Thus, the concerns raised by the Supreme Court in *Gardner–Denver* over the tension between collective bargaining and in-

---

**5.** The Third Circuit recently upheld the exclusivity of the arbitration remedy in a collective bargaining case. *See Martin v. Dana Corp.,* 114 F.3d 421 (3d Cir.1997). However, that opinion has been vacated, and the appeal will be re-heard *en banc. See Martin v. Dana Corp.,* 114 F.3d 428 (3rd Cir.1997). In addition, significant factors ill

the Third Circuit's now-vacated decision included the facts that the CBA at issue (1) empowered the employee to pursue arbitration without the permission of the union; and (2) explicitly provide for arbitration of statutory discrimination claims.

dividual rights are present in this action in that (1) the union, not Plaintiff individually, negotiated and agreed to the arbitration clause; and (2) by the terms of the MOU, only the union, on behalf of an affected employee, may seek arbitration.

Third, Defendants do not suggest that Plaintiff's claims are subject to the FAA.

■ Therefore, for the foregoing reasons, the court finds that the instant action is governed by *Gardner–Denver*, and concludes that Plaintiff's federal statutory causes of action are not precluded by the arbitration decision.[6]

## B. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFF'S CLAIMS UNDER TITLE VII, FEHA, THE ADA, AND § 1981 IS GRANTED

■ Defendants also move for summary judgment on the merits of Plaintiff's claims under Title VII, FEHA, the ADA and § 1981. Claims of employment discrimination under FEHA and the federal anti-discrimination statutes (here, Title VII, the ADA and § 1981) are subject to a shifting burden analysis. The plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to produce evidence of a legitimate, non-discriminatory motive for the action of which the plaintiff complains. If the defendant carries this burden of production, then the plaintiff must demonstrate that the legitimate reasons offered by the defendant are not the true reasons, but a pretext for discrimination. *See St. Mary's*

*Honor Center v. Hicks*, 509 U.S. 502, 506–507, 113 S.Ct. 2742, 2746–2747, 125 L.Ed.2d 407 (discussing *McDonnell Douglas* "shifting burden" standard); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (9th Cir.1996) (analyzing Title VII, ADA and FEHA claims under shifting burden analysis); *Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir.1985) (Title VII standards are used to prove § 1981 claim of employment discrimination), *op. amended*, 784 F.2d 1407 (9th Cir.1986). Evidence that a defendant's proffered reasons for termination are not credible, together with the elements of a prima facie case, provides a sufficient legal basis upon which the trier of fact *may* infer that the termination was discriminatory (although it does not *compel* such a conclusion). *See St. Mary's Center*, 509 U.S. at 511 & n. 4, 113 S.Ct. at 2749 & n. 4.

Defendants do not raise an issue on this motion as to whether Plaintiff can make out a prima facie case of discrimination. Rather, Defendants focus exclusively on their justification for terminating Plaintiff.[7] Defendants contend that the ground for discharge was that Plaintiff threatened to take the lives of his supervisors in the Public Works Department, and that this justification is supported by the following evidence: (1) Plaintiff's statements to Officer Shannon wherein Plaintiff threatened to kill someone (*see* King Decl. at Ex. 1 at 29:18–19); (2) Plaintiff's testimony in his deposition that he told Dr. Harrison that he would have shot his supervisors if he had a gun (*see* Hogan Decl. at Ex. A); and (3) the written decision of the arbitrator in Defendants' favor, which includes, *inter alia*, a finding of fact that public health authorities issued *Tarasoff* warning

---

**6.** Although *Gardner–Denver* only expressly deals with Title VII, the reasoning of the decision applies equally to Plaintiff's claims under § 1983, § 1981, and the ADA, all of which protect individual rights. *See Brisentine*, 117 F.3d 519, 521. In addition, the court notes that, although Defendants ostensibly moved for summary judgment on preclusion grounds on Plaintiff's claim under FEHA and the non-FEHA state law claims, Defendants failed to cite any authority or make any argument directed to the issue of preclusion of these state law claims. Therefore, the court declines to take up the issue of preclusion of Plaintiff's state law claims.

**7.** Although Defendants stated in the termination letter sent to Plaintiff that he was being dismissed for failure to observe rules and regulations, as well as for making threats of violence, Defendants focus only on the threats as justification for the termination. Therefore, this order does not address Plaintiff's alleged violation of rules and regulations as a reason for his termination.

letters to Plaintiff's supervisors (*see* Rentz Decl. at Ex. A).[8]

■ As noted above, the written decision of the arbitrator, upon which Defendants primarily rely, is admissible evidence. *See supra* at 997–998 n. 3. The decision constitutes evidence of non-discriminatory reasons sufficient to shift the burden to Plaintiff to come forward with evidence that the reasons given were pretextual.

■ Plaintiff submits no direct evidence of discrimination by Defendants nor evidence regarding the treatment of other non-Hispanic and/or non-disabled workers from which the court might infer discrimination. Rather, Plaintiff contends only that the justification proffered by Defendants is not credible on its face. *See St. Mary's Center,* 509 U.S. at 511 & n. 4, 113 S.Ct. at 2749 & n. 4 (evidence that defendant's proffered reasons for termination are not credible provides sufficient legal basis upon which trier of fact may infer termination was discriminatory). In support of this argument, Plaintiff submits the following evidence that Defendants did not perceive Plaintiff's threats as real, and, therefore, termination based on those alleged threats was a pretext:

(1) Beth Wallace, a secretary at the Public Works Department, testified at the arbitration that she spoke with Plaintiff on October 20, 1995, and that Plaintiff said he could kill somebody but that he wouldn't kill her. *See* King Decl. at Ex. I at 18:17–21. She also confirmed that, in a prior statement, she said that Plaintiff told her he wasn't going to do "anything like that because he was not that kind of person, and he wouldn't hurt me because he didn't even know me." *Id.* at 20:25–21:5.

(2) Officer Shannon testified that Plaintiff, when talking to Officer Shannon, did not threaten any particular person in Shannon's presence, but that Shannon inferred that Plaintiff meant to threaten his supervisors. *Id.* at 29:13–22.

(3) Ray Fultz testified that he believed he was physically threatened based on the receipt of the *Tarasoff* warning, not because of

any direct statement made to him by Plaintiff. *Id.* at 58:16–59:7.

(4) Jim Machado, a road worker, testified that Don Collins told him and other workers that he did not view Plaintiff as a threat. *Id.* at 85:24–86:4.

(5) In his statement to Dr. Harrison, Plaintiff stated that *if* he had a gun, he would shoot, or would have shot, his supervisors.

With respect to Ms. Wallace's testimony, the court surmises that Plaintiff is contending that Plaintiff's statement to Ms. Wallace that "he was not that kind of person" can be understood to mean that he is not the kind of person who would kill anyone, and that, therefore, Defendants could not have viewed Plaintiff's statements as threats. Even accepting Plaintiff's view that this statement can be viewed as somehow mitigating the seriousness of Plaintiff's threats, there is no evidence that this statement made by Plaintiff to Ms. Wallace, a secretary at the Public Works Department, was ever relayed to Defendants or any other decision-maker involved in Plaintiff's termination. Therefore, Defendants cannot be charged with knowledge of this supposedly "mitigating" statement.

With respect to Officer Shannon's testimony, while it is true that Officer Shannon testified that Plaintiff did not name his supervisors when, in Officer Shannon's presence, Plaintiff made threats to kill someone, this testimony does nothing to call into question Plaintiff's own deposition testimony that he indeed threatened his supervisors by name when speaking to Dr. Harrison.

With respect to Mr. Fultz's testimony, the fact that Mr. Fultz learned of Plaintiff's threat via a *Tarasoff* warning letter as opposed to being personally confronted by Plaintiff is immaterial. Mr. Fultz testified that he felt threatened by Plaintiff.

With respect to Mr. Machado's testimony that Don Collins stated that he did not feel threatened by Plaintiff, as with Ms. Wallace's testimony, there is no evidence that Mr. Col-

---

8. Defendants' counsel also submitted a declaration summarizing testimony given at the arbitration. *See* Rentz Decl. This summary is hearsay and, even though Plaintiff has not objected, will not be considered by the court on this motion.

lins—one of three threatened supervisors—was a decision-maker with respect to Plaintiff's termination, or that his statement was relayed to any decision-maker.[9]

With respect to Plaintiff's statement that he would shoot his supervisors if he had a gun, Plaintiff contends that, because the statement is qualified with the word "if," it cannot be perceived as a real threat because Plaintiff did not have the instrumentality to carry out the threat. Contrary to Plaintiff's suggestion, a reasonable trier of fact could not find that, simply because Plaintiff did not possess a gun at the moment he uttered his threat to Dr. Harrison, the threat could not have been perceived as real. Indeed, the mental health crisis team at Natividad Hospital, neutral third parties in the incident, viewed Plaintiff's threats as serious enough to warrant detention of Plaintiff for three days and *Tarasoff* warning letters to Plaintiff's supervisors.

At best, the evidence presented by Plaintiff constitutes a "scintilla" of evidence in Plaintiff's favor which is not sufficient to withstand summary judgment. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. Therefore, because Plaintiff has not met his burden of coming forward with evidence of discrimination upon which a reasonable trier of fact could find in his favor, Defendants' motion for summary judgment on Plaintiff's claims under Title VII, FEHA, the ADA and § 1981 is GRANTED.

## C. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFF'S CLAIMS UNDER § 1983 AND THE NON–FEHA STATE LAW CLAIMS IS GRANTED

■ Defendants also move for summary judgment on the merits of Plaintiff's discrimination claims under § 1983 and the non-FEHA state law claims. In order to shift the burden to Plaintiff of coming forward with evidence on these claims, Defendants

need only point out an absence of evidence of discrimination. Defendants' evidence of neutral justification for the decision to terminate Plaintiff (*see supra* at 1002) goes further than merely pointing out an absence of evidence—it constitutes some affirmative evidence that Defendants terminated Plaintiff for a non-discriminatory reason.

As discussed above, Plaintiff has not come forward in response with sufficient evidence upon which a reasonable jury could that Plaintiff's termination was discriminatorily motivated. Therefore, Defendants' motion for summary judgment on Plaintiff's discrimination claims under § 1983 and the non-FEHA state law claims is GRANTED.

## D. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFF'S FIRST AMENDMENT CLAIM UNDER § 1983 IS GRANTED

Defendants also move for summary judgment on Plaintiff's § 1983 claim for violation of his First Amendment rights.[10] Plaintiff claims that his statements regarding killing his supervisors were not true threats, and, therefore, were protected First Amendment speech. Plaintiff relies upon two cases in the criminal context that set out standards for determining whether a threat is a "true threat" for First Amendment purposes. *See U.S. v. Orozco-Santillan*, 903 F.2d 1262, 1265–1266 (9th Cir.1990); *U.S. v. Kelner*, 534 F.2d 1020, 1027 (2d Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976).

Plaintiff, however, is looking to the wrong law. As Defendants point out, the standard for determining whether a public employee's speech is protected by the First Amendment is set out in *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). In *Waters*, a § 1983 case involving an em-

---

**9.** The court also notes that Mr. Machado's testimony appears to be hearsay. However, because Defendants did not object to the testimony, and because it is possible that the statement by Mr. Collins might constitute an admission or a statement against interest, the court has considered Mr. Machado's testimony on this motion.

**10.** Because Defendants first raised this issue in their reply, the court granted Plaintiff leave to file a sur-reply on this issue on or before September 5, 1997. Plaintiff did not file a sur-reply.

ployee terminated because of statements she had made, the Supreme Court stated that:

> [t]o be protected [by the First Amendment], [a government employee's] speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to " 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' "

*Id.* at 668, 114 S.Ct. at 1884 (citations omitted). The *Waters* Court further observed that:

> the government as employer ... has far broader powers [to regulate speech] than does the government as sovereign.... [M]any of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees. The First Amendment demands tolerance of "verbal tumult, discord, and even offensive utterance," as "necessary side effects of ... the process of open debate,".... But we have never expressed doubt that a government employer may bar its employees from using ... offensive utterance[s] to members of the public, or to the people with whom they work.... Likewise, we have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.

*Id.* at 671–673, 114 S.Ct. at 1885–1886 (citations omitted). In *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983), a case arising under § 1983, the Ninth Circuit further clarified that "[s]peech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies." *Accord Roe v. City and County of San Francisco,* 109 F.3d 578 (9th Cir.1997) (same).

▉ Plaintiff's statements that he would kill his supervisors if he had a gun because he was unhappy with the manner in which the supervisors had treated him is not speech directed toward a matter of public concern. Rather, it clearly concerns a personnel dispute and private grievance between Plaintiff and Defendants.

Therefore, for the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's claim under § 1983 for violation of his First Amendment rights is GRANTED.

## V.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment on Plaintiff's claims under Title VII, the ADA, § 1981, § 1983, FEHA, and other provisions of state law is GRANTED.

IT IS SO ORDERED.