James M. BLAKELY, Sr., et al., Plaintiffs,

v.

USAIRWAYS, INC., Defendant.

No. Civ.A. 97–1402.

United States District Court, W.D. Pennsylvania.

Sept. 23, 1998.

---

Gary F. Lynch, Lynch & Kunkel, New Castle, PA, Gregory T. Kunkel, Lynch & Kunkel, Uniontown, PA, Colleen E. Ramage, Ramage & Valles, Pittsburgh, PA, for Plaintiffs.

Sidney Zonn, Buchanan Ingersoll, Pittsburgh, PA, Betty Leach Hawkins, U.S. Airways, Arlington, VA, for Defendant.

## OPINION

DIAMOND, District Judge.

Plaintiffs commenced this action seeking a declaration that certain policies and practices of USAirways, Inc. ("defendant") violate the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and corresponding injunctive and monetary relief. Presently before the court is defendant's motion to dismiss. For the reasons set forth below, the motion will be denied.

Plaintiffs are eight employees who claim that their rights under the ADA have been violated by defendant's administration of a company-wide "light-duty" work policy. Each plaintiff has been placed on light-duty status because of a work-related injury. Plaintiffs allege that defendant has engaged in a class-wide policy of discrimination against individuals protected by the ADA by failing to analyze separately each light-duty employee's physical abilities and restrictions and categorically denying such employees the opportunity to be considered for overtime work and other benefits and privileges of employment. Plaintiffs aver that they are

required to work in an area known as the "reclamation room," that management has engaged in and permitted other employees to engage in conduct which is demeaning and degrading to such employees and that defendant "has adopted and followed a policy of harassing, segregating, ostracizing and demeaning the plaintiffs and all other USAirways personnel on 'light-duty,'" thereby subjecting them to an illegal hostile work environment. Plaintiffs aver that they are subjected to these policies and practices and are treated adversely in the terms and conditions of employment because of their disabilities.

Each plaintiff is a member of the International Association of Machinists and Aerospace Workers ("IAMAW"), which has entered into a collective bargaining agreement ("CBA") with defendant. The CBA sets forth the general terms and conditions of plaintiffs' employment and mandates that members of the IAMAW and defendant submit to a binding and final grievance/arbitration process for resolving disputes arising under the CBA.

Defendant contends that plaintiffs' claims are "preempted" by the Railway Labor Act ("the RLA"), 45 U.S.C. § 151 *et seq.*, because plaintiffs' claims cannot be "disentangled" from the CBA. Defendant asserts that in order to place plaintiffs' claims within their proper perspective, the CBA must be "interpreted" to determine "what plaintiffs' job duties were, whether a reasonable accommodation existed that would allow plaintiffs to perform those duties, whether plaintiffs were qualified and eligible to work overtime within the meaning of the agreement, and what amount of overtime pay, if any, is allegedly due them." Defendant further posits that "the very source" of any right to overtime pay is the CBA itself.

Defendant also contends that plaintiffs' claims are subject to dismissal on the ground that the CBA's grievance and arbitration procedures provide the exclusive forum for resolving any disputes arising out of plaintiffs' employment. Defendant notes that the CBA provides that all employment disputes are subject to final and binding arbitration, which assertedly encompasses disputes pertaining to the improper denial of overtime and unlawful discrimination, and that all but

two of the plaintiffs already have invoked these contractual procedures prior to initiating the instant lawsuit. Against this backdrop it points out that the ADA specifically encourages arbitration and that the Supreme Court has a firmly entrenched policy of honoring agreements to arbitrate under the Federal Arbitration Act.

Plaintiffs oppose the motion on the ground that the right(s) which they now seek to vindicate arise from a federal statute which is independent of the CBA and argue that their claims are not precluded under the United States Supreme Court's recent precedent. Plaintiffs also contend that a resolution of their ADA claims does not require an "interpretation" of the CBA and argue that defendant cannot avoid its independent statutory obligations because, *inter alia,* the CBA does not address or authorize the policy and conduct which plaintiffs seek to have declared illegal. Finally, plaintiffs assert that while they are entitled to arbitrate their discrimination claims under the CBA's procedures for grieving disputes if they choose to do so, an individual's statutory right to proceed to court with a discrimination claim cannot be waived through a CBA.

Defendant initially observes that its 12(b)(1) motion seeks to dismiss plaintiffs' claims on the grounds that they are precluded by the RLA and are subject to final and binding arbitration under the CBA. It asserts that these issues pertain to the court's subject matter jurisdiction and thus evidence outside the pleadings may be considered without converting the motion into one for summary judgment. It further argues that plaintiffs bear the burden of establishing subject matter jurisdiction, and thus the allegations in the complaint need not be assumed to be true. Plaintiffs do not take issue with these assertions nor do they dispute the general facts advanced in support of defendant's arguments. Instead, plaintiffs challenge defendants' interpretation and application of the law.

Defendant advances the following in support of its contention that plaintiffs' claims are precluded by the RLA. Defendant is an international commercial air carrier. Plaintiffs are employed in various maintenance

jobs, are represented by the IAMAW and the contractual terms and conditions of their employment are set forth in the CBA. Article 4 of the CBA defines the duties and requirements for each position covered by the CBA. Seven of the plaintiffs are mechanics, which is defined in pertinent part:

> The work of a Mechanic shall consist of any and all work generally recognized as Mechanic's work performed on or about the aircraft, including the servicing of the aircraft in or about shops, Maintenance bases, Company buildings or equipment wherever located, including, but not limited to, mechanical work involved in the dismantling overhauling, repairing, fabricating, assembling, welding, and erecting all parts of airplanes, airplane engines, avionics equipment, instruments, electrical systems, heating systems, hydraulic systems, automotive equipment, and machine tool work in connection therewith, including all general building maintenance and construction work.

*Reprinted* at Exhibit A of Declaration of Richard Frey (Document 8) at pp. 14–15.

Article 6 of the CBA sets forth a body of rules which govern additional pay that can be earned for work outside normal working hours on a regular work day or on a holiday ("overtime"). According to defendant, the guiding overtime principle reflected in Article 6(E) is that "overtime shall be distributed as equally as possible among all qualified employees of a shop or shift whenever overtime is required." Article 6 indicates in general when overtime pay is available, the method for computing overtime pay, the qualification requirements for working overtime and the procedures and formulas used to determine eligibility. Defendant also observes that Article 6 provides the following guidelines concerning the selection of crews on a holiday:

> When a full scheduled crew is not required to work on a holiday, employees will be offered the holiday off on the basis of hiring date, seniority by classification, shift, and department until the reduced complement is achieved. Once the reduced complement is achieved and the Company finds it necessary to increase the complement, those employees in the bid area who were not afforded an opportunity to work by reason of such reduction will be asked to work first in order of hiring date, seniority by classification, shift and department prior to utilizing the overtime list. *Id.* at p. 27.

Article 8 governs, *inter alia,* seniority and bumping rights. It also provides that employees who are injured on the job and who cannot perform their regular work "will be given preference of such light work as they are able to handle within their work classification." Declaration of Richard Frey at ¶ 14. When an employee cannot perform his or her regular job due to a job-related injury, the limited work the employee can perform is known as "light-duty work." *Id.* at ¶ 15. The CBA further provides that all employees injured on the job prior to October 10, 1992, are entitled to receive their full pre-injury salary while on light duty. *Id.* Some of the plaintiffs have at various times worked under medical restrictions which would have precluded them from working more than eight hours per day. *Id.* at ¶ 18.

Each plaintiff has been assigned to work in the Hardware Sorting and Parts Reclamation Room ("the Reclamation Room"). The Reclamation Room was established by "special agreement" between the defendant and the IAMAW in 1996 and is one room in a large building called the Small Support Building, which contains several rooms used for the repair of small airplane parts. *Id.* at ¶ 20. Work within the Reclamation Room entails sorting small unused airplane parts and returning those parts to inventory by classifying them on a computer. From defendant's perspective the work permits employees restricted to light-duty to perform productive and valuable work while earning their full salaries during the period of recovery, and this arrangement has saved defendant substantial sums of money. *Id.* at ¶ 21. This work is not time sensitive and does not need to be performed on an overtime basis. *Id.*

The CBA also establishes a multi-step procedure for "the presentation and adjustment of disputes or grievances that may arise.... Any employee or group of employees who believe that they have been unjustly dealt with or that any provisions of this [CBA] have not been properly applied or interpret-

564

ed" may invoke the grievance procedures. *Id.* at ¶ 24. Article 15 establishes a binding arbitration procedure, culminating in a proceeding before the System Board of Adjustment, for resolving "disputes between any employee covered by [the CBA] and the [defendant] growing out of grievances or out of interpretation or application of any of the terms of [the CBA]." *Id.* This system of final and binding arbitration also is mandated by the RLA, which requires mandatory arbitration for disputes "growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 184.

Finally, Article 1 provides that defendant and the IAMAW shall not "discriminate against employees covered by [the CBA] because of race, color, religion, sex, national origin, age or handicap ..." and that they "agree to comply fully with all applicable Federal and State statutes and regulations regarding non-discrimination." Declaration of Richard Frey at ¶ 27. All but two of the plaintiffs filed grievances under the CBA and set forth the following statement in support of the proceeding:

The company (USAir) has willfully engaged in the practice of discrimination and harassment towards the grievant by not complying with the following but not limited to Civil Rights Act of 1974, Americans With Disabilities Act of 7–26–92 and the USAir–I.A.M. contract of 3–1–90 Art. 1 par A., Art 1 par F, Art 8 par J. The grievant seeks an end to the discrimination and harassment. The grievant further seeks to return to his bid area with the same rights and privileges as same classification "full duty" workers. The grievant will be seeking compensation for past, present, and future violations of all applicable state + federal statutes and laws and contract violations.

*Id.* at ¶ 28. Defendant complains that plaintiffs "now bring the very same claims in this lawsuit."

▮ Whether the RLA precludes a cause of action under a separate federal remedial statute is a question of Congressional intent. *See generally Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987). The RLA was enacted in 1926 and extended to the airline indus-

try in 1936. *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203, 208 (1994). "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Id.* at 211, 114 S.Ct. 2239 (*citing Buell,* 480 U.S. at 562, 107 S.Ct. 1410).

▮ Under the RLA two types of disputes between carriers and labor organizations have been recognized: disputes concerning the application or interpretation of agreements concerning rates of pay, rules and working conditions, which are known as "minor disputes" and are committed under Section Three of the RLA to the exclusive jurisdiction of the National Railroad Adjustment Board ("NRAB") or an arbitration panel of coordinate jurisdiction established by agreement; and "major disputes" which involve the formation or modification of collective bargaining agreements and must be pursued and resolved in accordance with the exclusive negotiation and mediation process mandated by Sections Five and Six of the RLA, 45 U.S.C. §§ 155, 156. Major disputes involve " 'the formation of collective bargaining agreements or efforts to secure them.' " *Norris,* 114 S.Ct. 2239, 129 L.Ed.2d at 211 (*quoting Consolidated Rail Corp. v. Railway Labor Executives Assn.,* 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989)). "Minor disputes 'involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.' " *Id.* (*quoting Brotherhood of Trainmen R.R. v. Chicago R. & I.R. Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)). Where a dispute between an employee and a carrier is a minor one within the meaning of the RLA, the NRAB or the adjustment board of coordinate jurisdiction retains exclusive jurisdiction over the dispute and thus a federal district court lacks statutory jurisdiction to adjudicate any substantive aspect of the controversy. *Id.* (*citing* 45 U.S.C. § 184; *Buell,* 480 U.S. at 563, 107 S.Ct. 1410; and *Consolidated Rail Corp.,* 491 U.S. at 302, 109 S.Ct. 2477).

▮ Defendant argues that resolution of plaintiffs' claims will entail an interpretation of the CBA and therefore they are minor

disputes which are within the exclusive jurisdiction of the Systems Board. Defendant points out that establishing a prima facie case under the ADA requires each plaintiff to prove that he or she is a "qualified individual with a disability," which encompasses a determination of (1) whether he or she physically is able to perform the essential job functions, with or without reasonable accommodation, and (2) whether he or she has the requisite skill, experience, and other requirements for the job desired. Defendant asserts that these determinations cannot be made "without interpreting [the CBA] for the purpose of ascertaining (1) what plaintiffs' essential job duties were, (2) whether a reasonable accommodation existed that would have allowed them to perform those duties, and (3) whether they were denied overtime work for which they were eligible and qualified to perform."

In support of the contention that the CBA will have to be interpreted to determine what each plaintiff's job duties were, defendant notes that the Equal Employment Opportunity Commission ("EEOC") has promulgated a regulation which indicates that a CBA may provide evidence of an employee's essential job functions, *see* 29 C.F.R. § 1630.2(n)(3)(v), and that the CBA here sets forth the duties of all established job classifications. According to defendant, this assessment will require scrutiny of Article 4, its arbitral history and the parties' practice under it (including the division of work between the subspecialties within the mechanic job classification) and any relevant System Board decisions. By way of example defendant notes that the System Board already has determined that defendant's ability to provide accommodations might be restricted where the number of employees among whom the work can be distributed is limited.

Defendant also observes that the ADA provides that reasonable accommodations may include:

job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or material or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B). Citing to recent cases which have held that a requested accommodation which necessarily infringes on the seniority rights of co-workers is *per se* unreasonable due to the special status of seniority rights established through the history of labor relations, *see, e.g., Kralik v. Durbin*, 130 F.3d 76 (3d Cir.1997) (recognizing that collectively bargained seniority rights have a special status and holding that a requested accommodation which would require the employer to violate the seniority rights of another employee under a CBA is *per se* unreasonable), defendant projects that any accommodation to be considered may require an interpretation of the CBA.

Finally, defendant argues that damages cannot be calculated "without becoming enmeshed in several complicated issues of contract interpretation." These include whether any particular plaintiff physically was able to perform the required work, whether he or she held any necessary licenses, whether he or she had the necessary training and experience, whether he or she held the proper status on the applicable overtime eligibility list and whether he or she had the requisite seniority rights within the classification, shift and department.

Defendant's attempt to corral the instant dispute into one that is dependent upon an interpretation of the CBA is unavailing for a number of reasons. First, it readily is apparent that defendant's arguments are based upon a misconception of the terms "interpretation" and "application" of a CBA within the meaning of the RLA. Under defendant's view the court would be precluded from considering an ADA claim by virtually any unionized employee because a CBA would have to be "interpreted" to ascertain whether each element of the prima facie case had been established. Defendant has failed to identify any provision in the ADA which creates such a broad limitation on its reach.

Moreover, the United States Supreme Court consistently has held that the statutes governing the relationship between employers and unions do not preclude individual workers from commencing actions under federal statutes which provide entitlement to

independent minimum substantive guarantees to protected class workers. In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court considered whether an employee could commence a Title VII action for an alleged racially motivated discharge when the employee had submitted a claim under final and binding grievance and arbitration procedures set forth in a CBA which contained a nondiscrimination clause and the arbitrator had found that the employee had been discharged for just cause. The parties did not dispute that the arbitration proceeding and the federal court action were based on the same facts and circumstances. The district court granted summary judgment to the employer, reasoning that the employee was bound by the prior arbitral decision. The court of appeals affirmed. The Supreme Court reversed.

A unanimous Court advanced several reasons in support of its decision. In enacting Title VII, Congress had granted individual employees a non-waivable, public law right to equal employment opportunities which were separaté and distinct from the rights created through the "majoritarian processees" of collective bargaining. The Court observed that in submitting a grievance to arbitration, an employee seeks to vindicate his contractual right under the agreement itself where, by contrast, in filing a lawsuit under a federal remedial statute, an employee asserts independent statutory rights accorded by Congress. "The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums." *Id.* at 50, 94 S.Ct. 1011.

The Court further opined that unions traditionally have been given only the authority to waive certain statutory rights which relate to collective activity, such as the right to strike. *Id.* at 51, 94 S.Ct. 1011 (*citing Mastro Plastics Corp. v. N.L.R.B.*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956)). The rights that are conferred on employees collectively to foster the processees of bargaining may be exercised or relinquished by a majority for the economic benefit of their members as a whole, but permitting the collective waiver of statutorily granted minimum substantive protections to individuals would be inimical to the purposes behind such remedial statutes. *Id.* at 51–52, 94 S.Ct. 1011. Because such rights may not be waived prospectively, existing contractual rights incorporating these minimal substantive guarantees must be understood to operate in the limited economic bargaining structure within which the contractual rights are created. *Id.* at 52, 94 S.Ct. 1011 (*citing J.I. Case Co. v. N.L.R.B.*, 321 U.S. 332, 338–39, 64 S.Ct. 576, 88 L.Ed. 762 (1944)) ("It is settled law that no additional concession may be extracted from any employee as the price for enforcing [collective bargaining] rights.").

The Court also emphasized that a contractual right to submit a claim to arbitration is not minimized or displaced simply because Congress also has provided a statutory right to seek redress in court for individual treatment. A labor arbitrator's task is to effectuate the intent of the parties as reflected in a CBA and the source of authority is the agreement itself, which must be interpreted in accordance with industry practice and the common law of the shop. An arbitrator has no general authority to invoke the public laws that conflict with the bargain between the parties and his award is legitimate only so long as it draws its essence from the collective agreement itself. *Id.* at 53, 94 S.Ct. 1011. If the arbitral decision is based upon the requirements of an act of legislation, rather than an interpretation of the collective-bargaining agreement itself, it is well established that the arbitrator has "exceeded the scope of the submission" and the award is unenforceable. *Id.* In other words labor arbitration resolves only questions of contractual right "and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, substantive rights secured by [separate federal remedial statutes]." *Id.* at 54., 94 S.Ct. 1011 "Both rights have legally independent origins and are equally available to the aggrieved employee." *Id.* at 52, 94 S.Ct. 1011.[1] Ac-

---

1. The Court also expressed the view that judgments from federal arbitration proceedings are

not to be given preclusive effect in subsequent court actions because such a rule would be in-

cordingly, the Court concluded that the federal policies of favoring arbitration of labor disputes and eliminating discriminatory employment practices properly were accommodated by permitting an employee to pursue fully both his remedy under a grievance/arbitration clause of a CBA and a separate cause of action in federal court under Title VII. *Id.* at 59–60, 94 S.Ct. 1011.

The Court consistently has followed the teachings of *Alexander.* In *Barrentine v. Arkansas–Best Freight System,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), the Court considered whether an employee could bring an action in federal court alleging a violation of the minimum wage provisions of the Fair Labor Standards Act ("FLSA") after having unsuccessfully submitted a wage claim based on the same underlying facts to a grievance committee pursuant to the provisions of a CBA. The Court reiterated that various rights established through the system of majoritarian rule and industrial self-government are

> protected not for their own sake but as an instrument of the national labor policy of minimizing industrial strife by encouraging the practice and procedure of collective bargaining ... [and in this context] final adjustment by a method agreed upon by the parties is declared to be the desirable method of settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. 29 U.S.C. § 173(d).

*Id.* at 735, 101 S.Ct. 1437. However, "different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers."

*Id.* at 737, 101 S.Ct. 1437. Following *Alexander,* the Court refused to distinguish the FLSA action because the questions raised, although arising from the same factual setting as a prior grievance and arbitration procedure, placed at issue threshold questions which were governed by a federal statutory scheme that was designed to provide minimum protections to individual workers.[2] The Court thus concluded that an employee's FLSA rights were independent of a CBA, were not waivable in advance, and claims based upon those rights were not barred by the prior submission of factually identical grievances to a dispute-resolution procedure mandated by a CBA.

In *McDonald v. City of West Branch, Mich.,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Court considered whether a § 1983 action was precluded by an unappealed arbitration award which was based on the same facts. The plaintiff was a police officer whose employment was governed by a CBA between a local municipality and the United Steelworkers of America. The dispute turned on whether there was proper cause for termination and an arbitration proceeding resulted in an adverse ruling against the employee. The plaintiff alleged that he had been discharged for exercising his First Amendment rights of freedom of speech, freedom of association and freedom to petition the government for redress of grievances. The case was tried to a jury which returned a partially favorable verdict. The United States Court of Appeals for the Sixth Circuit reversed, reasoning that the parties had agreed to settle their disputes through arbitration and that the arbitrator had passed on the reasons for the employee's

---

congruous with the Congressional intent to provide federal courts with final responsibility in enforcing separate remedial legislation. In this regard the Court opined that "the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of the enacted legislation[,]" makes an arbitration proceeding a forum ill-equipped for deciding pressing legal issues of public importance in part because in general arbitral factfinding is not equivalent to judicial factfinding due to the factors which make arbitration efficient, inexpensive and expedient (i.e., the usual rules of evidence do not apply and the rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination and testi-

mony under oath often are limited severely or unavailable). *Id.* at 57–58, 94 S.Ct. 1011.

2. In addition to noting that the potential for a utilitarian-base compromise, the specialized competence of the arbitrators and the concomitant scope of their authority militate against permitting such bodies to resolve questions of important public policy under independent federal statutes, the Court observed that the relief which may be granted pursuant to an arbitral labor proceeding generally is limited as compared to that which typically is afforded to the courts through a remedial statute. *Id.* at 743–45, 101 S.Ct. 1437.

discharge. After finding that the arbitration process had not been abused, the Sixth Circuit concluded that the employee's First Amendment claims were barred by *res judicata* and collateral estoppel. *Id.* at 285–87, 104 S.Ct. 1799. The Supreme Court reversed, holding that an arbitration award rendered pursuant to the machinery of a collective bargaining agreement is not to be afforded *res judicata* or collateral estoppel effect in a subsequent § 1983 action essentially for the same reasons advanced in *Alexander* and *Barrentine.* *Id.* at 290–92, 104 S.Ct. 1799.

The Court recently considered in *Buell* whether the provisions of the RLA precluded an employee's cause of action under the Federal Employers' Liability Act ("FELA") where the alleged breach of duty to provide a safe workplace was based upon a scenario which typically gives rise to a labor dispute under the RLA. The railroad argued that its employees had the right to have defects in the workplace corrected through the grievance machinery established in a CBA, and therefore the RLA provided the exclusive remedy for such minor disputes. The railroad also argued that because the plaintiff had invoked that machinery prior to pursuing the action, the employee was barred from initiating a subsequent FELA action. The Court observed that it had repeatedly rejected the contention that individual employees are barred from bringing claims under federal statutes simply because of the availability of arbitration established through the collective bargaining process and explained that "the theory running through these cases is that notwithstanding the strong policies encouraging arbitration, 'different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.'" *Buell,* 480 U.S. at 565, 107 S.Ct. 1410. Following this principle the Court opined:

> The FELA not only provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its collective-bargaining agreement, but also affords injured workers a remedy suited to their needs, unlike the limited relief that seems to be available through the

Adjustment Board. It is inconceivable that Congress intended that a worker who suffered a disabling injury would be denied recovery under the FELA simply because he might also be able to process a narrow labor grievance under the RLA to a successful conclusion.

*Id.* Thus, the Court consistently has concluded that the RLA minor dispute resolution machinery does not displace separate federal statutory rights granted to individual workers.

The same considerations which have given rise to the longstanding precedent of the Court guide the resolution of the instant motion. The findings accompanying the passage of the ADA evidence Congress' belief that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally" and that these individuals form "a discreet and insular minority who have been subjected to a history of unequal treatment." 42 U.S.S. § 12101(a)(6) & (7). Congress further declared as pubic policy the goals of assuring for such individuals equality of opportunity, full participation, independent living and economic self-sufficiency. 42 U.S.C. § 12101(a)(8). Thus it passed the ADA for the purposes of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), to provide a clear, strong, consistent and enforceable standard of addressing discrimination against such individuals and "to ensure that the federal government plays a central role in enforcing the standards established" by the ADA. 42 U.S.C. § 12101(b)(2) & (3). Congress made the powers, remedies and procedures set forth in various sections of Title VII the powers, remedies and procedures available under the ADA and vested the authority to enforce those provisions in the EEOC, the Attorney General or "any person alleging discrimination on the basis of a disability in violation of" the ADA or the concomitant employment regulations promulgated by the EEOC. 42 U.S.C. § 12117(a). Thus, the ADA is a remedial statute which provides minimum substantive protections to a protected class of individual workers.

There also is ample indication that Congress understood that the statute would regulate entities and arrangements falling within the scope of the RLA. Congress expressly provided that the ADA's prohibition against discrimination extends to a "contractual or other arrangement or relationship which has the effect of subjecting a covered entity's qualified applicant or employee with a disability to discrimination," including the relationship with a labor union. 42 U.S.C. § 12112(b)(2). The reports of the House Committee on Education and Labor and of the Senate Committee on Labor and Human Resources likewise contained language which indicated that the ADA expressed a Congressional desire to give individuals of the protected class minimum substantive protections which were independent of the employee's collective bargaining rights. These reports provided in pertinent part:

> The collective bargaining agreement could be relevant ... in determining whether a given accommodation is reasonable. For example, if a collective bargaining agreement reserves certain jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable accommodation to assign an employee with a disability without seniority to that job. However, the agreement would not be determinative on this issue.

H.R. No. 485(ii), 101 St. Cong.2d Sess. 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 345; S.Rep. No. 101–116 at 32 (1989). Thus, it is clear that Congress understood that the ADA prohibitions would be applicable to employers which operate within the sphere of federal labor law.

█ Furthermore, defendant has cited no provision in the ADA or its legislative history which suggests that the fact-intensive individualized inquiries mandated by the ADA are to be relegated to the exclusive arbitration process mandated by the RLA where those inquiries must be made in the context of a work environment regulated by a CBA. The core anti-discrimination section of the ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures,

the hiring, advancement or discharge of employees, employee compensation, job training, or other terms, conditions, and privileges of employment.

42 U.S.C. § 12112. "In order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability." *Deane v. Pocono Medical Center,* 142 F.3d 138 (1998), en banc (*citing Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998)). Congress provided a definition of a disability at 42 U.S.C. § 12102(2) and the EEOC has promulgated regulations at 29 C.F.R. § 1630.2(g) to assist in identifying a protected disability. The ADA defines a qualified individual as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The determination of whether an individual can perform the essential functions of the position held or sought involves the following:

> First, a court must consider whether the individual can perform the essential functions of the job without accommodation. If so, the individual is qualified (and, *a fortiori*, is not entitled to accommodation). If not, then a court must look to whether the individual can perform the essential functions of the job with a reasonable accommodation. If so, the individual is qualified. If not, the individual has failed to set out a necessary element of the prima facie case.

*Deane,* 142 F.3d 138 (noting that a definition of an accommodation is set forth at 29 C.F.R. pp. 1630, App. § 1630.2(*o*)).

█ The prima facie case under the ADA makes clear that Congress understood that courts routinely would be examining the requirements of various positions of employment. The factually intense inquiries undertaken in assessing the elements of a prima facie case provide a separate independent statutory basis for consulting the provisions of a CBA. Any incidental consultation of a CBA during this process would not give rise to or vindicate contractual rights for all union employees, but merely fulfills a fact inquiry

mandated by Congress in assuring employer compliance with minimum substantive guarantees. Although Congress provided for certain defenses and limitations on the scope and reach of the obligations imposed upon covered entities, *see, e.g.,* 42 U.S.C. § 12113 (establishing as a general defense requirements which are job-related and consistent with business necessity) and 42 U.S.C. § 12112(b)(5)(A) (making it illegal to deny reasonable accommodation to a covered individual unless it can be demonstrated that the accommodation would impose an undue hardship on the operation of the employer), nowhere in the ADA did Congress see fit to preclude a court from performing its statutory obligations simply because those obligations must be performed within the context of a work environment governed by the RLA. Thus, in light of the Court's precedent in *Alexander, Barrentine, McDonald* and *Buell* and Congress' failure to provide otherwise in passing the ADA, it follows that the RLA does not preclude a protected employee from vindicating his or her minimum substantive protections in a traditional forum pursuant to procedures which expressly are authorized.

The conclusion that the RLA does not preclude an individual ADA claim further is supported by the Court's recent jurisprudence concerning the RLA's preemption of state law. In *Norris,* the Court considered whether the RLA preempted state law causes of action for wrongful discharge in violation of public policy as expressed in the Federal Aviation Act and Hawaii's Whistle Blower Protection Act. The plaintiff was an aircraft mechanic licensed by the Federal Aviation Administration. His employment also was governed by a CBA due to his membership in the IAMAW. During a routine pre-flight inspection the plaintiff discovered that an axle sleeve was scarred and grooved, and concluded that the sleeve could cause the aircraft's landing gear to fail. The plaintiff recommended that the sleeve be replaced, but his supervisor ordered that it be sanded and returned to the aircraft. The plaintiff refused to sign a maintenance record at the conclusion of the shift certifying that the repair had been performed satisfactorily and that the aircraft was fit to fly. The plaintiff was suspended and invoked the applicable grievance procedures; he was terminated for insubordination. The plaintiff appealed under the applicable grievance procedure, but did not pursue the appeal to its final conclusion. Instead, he commenced a state law action for wrongful discharge and breach of the CBA. The defendant removed the action. The district court dismissed the breach of contract claim as preempted, and remanded the remaining claims. The state trial court then dismissed the plaintiff's claim of discharge in violation of public policy, reasoning that it too was preempted by the RLA's exclusive arbitral procedures, and certified its order as final. The Supreme Court of Hawaii reversed, concluding that the RLA did not preempt the state tort actions where the dispute was not limited to contractually defined rights. The United States Supreme Court granted certiorari. *Norris,* 114 S.Ct. 2239, 129 L.Ed.2d at 209–11.

After noting that the question of state law preemption is a matter of Congressional intent and that preemption of employment standards within the traditional police powers of the state should not be lightly inferred, the Court summarized the purpose and arbitral framework of the RLA. The Court reiterated "that the category of minor disputes contemplated by § 151(a) are those that are grounded in the collective-bargaining agreement." *Id.,* 114 S.Ct. 2239, 129 L.Ed.2d at 213 (*citing Consolidated Rail Corp.,* 491 U.S. at 305, 109 S.Ct. 2477 ("the distinguishing feature of a minor dispute is that the dispute may be conclusively resolved by interpreting the existing CBA")) (other citations omitted). It also opined that its prior caselaw had "held that the RLA's mechanism for resolving minor disputes does not preempt causes of action to enforce rights that are independent of the CBA." *Id.* It observed that within the context of wrongful discharge its prior caselaw supported a finding of RLA preemption only where "the only source" of the right not to be discharged was a CBA and applied its precedent to the matter at hand as follows:

> Here, in contrast the CBA is not the "only source" of respondent's right not to be discharged wrongfully. In fact, the "only source" of the right respondent asserts in this action is state tort law. Wholly apart

from any provision of the CBA, petitioner had a state-law obligation not to fire respondent in violation of public policy or in retaliation for whistle blowing. The parties' obligation under the RLA to arbitrate disputes arising out of the application or interpretation of the CBA could not relieve petitioners of this duty.

*Id.* at 214–15, 114 S.Ct. 2239. The Court further opined that *Buell* firmly had established that independent causes of action are not precluded or preempted by the RLA simply because the same course of underlying conduct "may have been subject to arbitration under the RLA." It noted that *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), had "made clear that the existence of a potential CBA-based remedy did not deprive an employee of independent remedies available under state law [and had] recognized that where the resolution of a state-law claim depends on an interpretation of the collective-bargaining agreement, the claim is pre-empted." Norris, 114 S.Ct. 2239, 129 L.Ed.2d at 216–17. It cautioned, however, that while "the state law analysis might well involve attention to the same factual considerations as the contractual determination whether [the plaintiff] was fired for just cause, ... such parallelism [does not] render the state law analysis dependent upon the contractual analysis." *Id.* 114 S.Ct. 2239, 129 L.Ed.2d at 217 (*quoting Lingle,* 486 U.S. at 408, 108 S.Ct. 1877).[3] The Court adopted the *Lingle* framework for addressing preemption under the RLA because "[t]he pre-emption standard that emerges from the line of cases leading to *Buell*—that a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the collective-bargaining agreement—is virtually identical to the pre-emption standard the Court employs in cases involving § 301 of the LMRA...." *Id.* 114 S.Ct. 2239, 129 L.Ed.2d at 215–16. Applying this standard, the Court concluded:

> Turning to the case before us, the question under *Lingle* is whether respondent's state-law wrongful discharge claims are independent of the collective-bargaining agreement. Petitioner's argue that resort

to the agreement is necessary to determine whether respondent, in fact, was discharged. This agreement is foreclosed by *Lingle* itself. *Lingle* teaches that the issue to be decided in this case—whether the employer's actions make out the element of discharge under Hawaii law—is a "purely factual question." ...

> Nor are we persuaded by petitioners' contention that the state tort claims require a determination whether the discharge, if any, was justified by respondent's failure to sign the maintenance record, as the agreement required him to do. Although such a determination would be required with regard to respondent's separate allegation of discharge in violation of the agreement, the District Court dismissed that count as pre-empted by the RLA, and respondent does not challenge that dismissal. The state tort claims, by contrast, require only the purely factual inquiry into any retaliatory motive of the employer.

*Id.* 114 S.Ct. 2239, 129 L.Ed.2d at 220.

The courts of appeals which have had the benefit of the teachings of *Norris* have held that the federal labor law statues do not preempt state law disability discrimination claims. For example, in *Martin Marietta Corp. v. Maryland Commission on Human Relations,* 38 F.3d 1392 (4th Cir.1994), the court considered and rejected the contention that a state law claim of handicap discrimination was preempted under the LMRA because the plaintiff essentially was contesting a denial of reinstatement to his former position and would be required to show that he was qualified to perform the job, an inquiry which the employer insisted would require reference to the governing CBAs. The applicable anti-discrimination statute had been interpreted to impose a non-negotiable right to be free from handicap discrimination and a right to reasonable accommodation. *Id.* at 1400–01. The court rejected the contention that consulting the terms of the CBA necessarily involved an "interpretation" of those agreements within the meaning of the LMRA:

> It seems likely that Price's handicap discrimination claim involves no real issue of

---

**3.** *Lingle* had presented the question of whether a state law retaliatory discharge claim was

preempted under the Labor Management Relations Act.

interpretation of the CBAs as in *Lingle,* . . . but simply requires a factual determination to be made on the basis of expert testimony. If the final resolution of the state law dispute tangentially involves some interpretation of a provision of the agreement, this fact alone would not require automatically that Price's claim be preempted by § 301. As the Supreme Court recognized in *Lingle,* a complete resolution of a state law claim may depend on both the meaning of a specific term in a CBA and separate analysis under state law, but in such a case, federal law would govern the interpretation of the agreement, and state law analysis would not be preempted.

*Id.* at 1401. Thus, the court concluded that there was "no preemption as Price's handicap discrimination claim [was] based on state law and [was] not inextricably intertwined with construction and application of terms of the CBAs." *Id.* at 1402.

Similarly, in *Taggart v. Trans World Airlines, Inc.,* 40 F.3d 269 (8th Cir.1994), the court opined:

Following the analysis in *Norris,* we think Taggart's state law handicap discrimination claim is not pre-empted by the RLA. The question under *Norris* is whether Taggart's state law handicap discrimination claim is independent of the collective bargaining agreement. First, as in *Norris,* the collective bargaining agreement is not the "only source" of Taggart's right not to be terminated wrongfully. In fact, like the mechanic in *Norris,* the "only source" of the right Taggart asserted in the present case is state law, that is, she claimed TWA wrongfully terminated her in violation of state law, independent of the collective bargaining agreement. Next, under *Norris,* the fact that Taggart may have a potential remedy based on the collective bargaining agreement does not deprive her of independent remedies available under state law. This is so even where the resolution of the state law claim and the claim under the collective bargaining agreement will involve the "same factual inquiry."

*Id.* at 274. Accordingly, the court held that "under *Norris* Taggart's state law handicap

discrimination claim [was] not preempted by the RLA." *Id.* at 275.

The United States Court of Appeals for the Ninth Circuit likewise has held that neither the LMRA or the RLA preclude state law handicap discrimination claims. *See Jimeno v. Mobil Oil Corp.,* 66 F.3d 1514, 1528 (9th Cir.1995) (following *Norris* and holding that LMRA did not preempt state law claim for physical disability discrimination in employment because the source of claim was an independent adjudicable employment right); *Espinal v. Northwest Airlines,* 90 F.3d 1452, 1458 (9th Cir.1996) (opining that *Norris* "substantially narrowed the scope of RLA preemption" and concluding that the plaintiff's state law disability discrimination claims were not dependent upon an interpretation of the applicable CBA and thus were not preempted).

Here, in assessing the plaintiffs' right to protection under the ADA, the court will be required to make a legal determination of whether the ADA mandates the asserted individualized assessment under the developed facts and circumstances and will be required to engage in a purely factual inquiry as to whether the challenged policy existed and, assuming that it did, the motives of defendant in establishing and applying the challenged policy. Plaintiffs' hostile work environment claim likewise does not depend upon an interpretation of CBA within the meaning of the RLA. The fact that a particular plaintiff may have to prove eligibility and qualification under the CBA for overtime on any particular occasion in order to be entitled to monetary damages does not involve an interpretation of the CBA because plaintiffs' claims are not grounded in a dispute over the meaning of the applicable overtime provisions therein, but instead pertain to defendant's motives for establishing the policy and assertedly precluding plaintiffs from being considered for overtime as a matter of company policy. Furthermore, the fact that each plaintiff had a right to grieve the challenged practices under the CBA does not bar their independent claims under the ADA. Accordingly, defendants' motion to dismiss on the ground of RLA preclusion must be denied.

■ Defendant alternatively contends that even if plaintiffs' claims are not "preempted,"

the claims nevertheless are subject to the mandatory arbitration provisions in the CBA, thereby making the CBA's final and binding arbitration machinery the exclusive forum for their resolution. Defendant notes that Article 14 of the CBA establishes a grievance procedure for "the presentation and adjustment of disputes or grievances that may arise" for "any employee or group of employees who believe that they have been unjustly dealt with or that any provisions of [the CBA] have not been properly applied or interpreted." Article 15 establishes a System Board Arbitration to resolve "disputes between any employee covered by [the CBA] and the company growing out of grievances or out of interpretation or application of any of the terms of [the CBA]." This arbitration is "final, binding and conclusive between the company and the union and anyone they represent having an interest in the dispute." Defendant also notes that Article 1 of the CBA requires defendant and the IAMAW to comply fully with all applicable federal and state anti-discrimination laws and that a number of the plaintiffs have invoked the grievance/arbitration procedures by initially pursuing their disability discrimination claims in that forum and seeking therein all available statutory remedies. Defendant thus contends that arbitration provides the exclusive avenue for resolving plaintiffs' ADA claims.

In support of this contention defendant relies on *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), and *Austin v. Owens–Brockway Glass Container*, 78 F.3d 875 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). In *Gilmer*, the Supreme Court considered whether an agreement between an employee of a brokerage firm and the New York Stock Exchange required the employee to arbitrate a claim under the Age Discrimination in Employment Act. As a condition of employment, the employee was required to register with several stock exchanges, including the New York Stock Exchange ("NYSE"). The registration application mandated the arbitration of any controversy between a registered representative and a NYSE member, including those "arising out of the employment or ter-

mination of employment of such registered representative." Thereafter, the plaintiff was terminated at the age of 62 and filed a charge of age discrimination in the district court. The Supreme Court upheld the agreement to arbitrate as the exclusive remedy, concluding that the individual had agreed to present all employment claims to that forum as a condition of employment and the policies underlying the Federal Arbitration Act required enforcement of the agreement to arbitrate all claims, including the plaintiffs' age discrimination claim. In assessing various arguments in support of the contention that the agreement to arbitrate should be held inapplicable to employment claims, the Court noted that under the NYSE arbitration rules the parties were (1) able to become informed of the employment histories of the arbitrators and to make inquiries into their backgrounds, and (2) given the use of one peremptory challenge and unlimited challenges for cause in the selection of the arbitration panel, thus giving the parties the tools to retain competent, conscientious and impartial arbitrators. It further noted that the NYSE discovery provisions permitted document production, information requests, depositions and subpoenas and thus, although not as extensive as discovery in federal court, the claimant had the ability to produce an adequate record in support of his claims. Finally, the NYSE rules did not restrict the types of relief an arbitrator may award, undermining the argument that the process could not provide for broad equitable relief in any particular case.

The Court carefully distinguished *Alexander*, *Barrentine* and *McDonald* on the ground that those cases had considered arbitration clauses in the context of CBAs and addressed whether arbitrated grievances barred the subsequent commencement of an independent action based upon the same conduct. It noted that the principles supporting the *Alexander* line of cases were based upon the well-settled understanding that the labor arbitrator has the authority only to resolve questions of contractual rights and the arbitrator's task is to effectuate the intent of the parties. It also observed that the labor arbitrator does not have the "general authority to invoke public laws that conflict with the bargain between the parties" and the subse-

quent federal court actions did not seek review of the arbitrator's decision, but instead asserted statutory rights independent of the arbitration process. *Id.* at 34, 111 S.Ct. 1647 (*quoting Alexander*, 415 U.S. at 53–54, 94 S.Ct. 1011). It also noted that "[a]n important concern [in the *Alexander* line of cases] was the tension between collective representation and individual statutory rights, a concern not applicable to [Gilmer's] case." *Id.* at 35, 111 S.Ct. 1647. Finally, in distinguishing *Alexander*, the Court eschewed the view expressed therein that "arbitration was inferior to the judicial process for resolving statutory claims, noting that 'mistrust of the arbitral process ... has been undermined by our recent arbitration decisions.'" *Id.* at 34 n. 5, 111 S.Ct. 1647.

An overwhelming majority of the courts of appeal have determined that employees covered by CBAs containing mandatory arbitration clauses retain the right to pursue statutory employment discrimination claims in federal court regardless of whether the employee has exhausted his or her contractual remedy. *See Penny v. United Parcel Service*, 128 F.3d 408, 413–14 (6th Cir.1997); *Brisentine v. Stone & Webster Engineering Corp.*, 117 F.3d 519, 526–27 (11th Cir.1997); *Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1453–54 (10th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2364, 141 L.Ed.2d 732 (1998); *Pryner v. Tractor Supply Corp.*, 109 F.3d 354, 363–64 (7th Cir.); *cert. denied*, —— U.S. ——, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997); *Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1213 (8th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997). "[T]he

majority view is that *Alexander* and its progeny remain good law and statutory employment claims are independent of a collective bargaining agreement's grievance and arbitration procedures." *Harrison*, 112 F.3d at 1453.

To date only the United States Court of Appeals for the Fourth Circuit has extended the holding in *Gilmer* to require the arbitration of employment discrimination claims pursuant to the terms of a CBA. In *Austin*, a divided panel of the Fourth Circuit concluded that a CBA which required the employer and union to comply with all laws preventing discrimination and further provided that all claims under the article prohibiting discrimination "shall be subject to the grievance procedure" effectively waived the individual employee's right to pursue independent litigation. Relying on precedent which consistently has recognized the enforceability of an individual contract which requires the arbitration of employment disputes, the court reasoned that the only difference in the case was that the requirement to arbitrate the employment discrimination claim arose in the context of a CBA and there was "no reason to distinguish between a union bargaining away the right to strike and a union bargaining for the right to arbitrate." *Austin*, 78 F.3d at 885. The majority further reasoned that because the right to arbitrate is a term or condition of employment, the union may bargain or relinquish the right on behalf of its members. *Austin*, 78 F.3d at 885. The dissenting judge opined that the majority had failed to recognize that the only difference made all the difference. *Id.* at 886 (J. Hall dissenting).[4]

---

4. A divided Third Circuit panel initially agreed with the Fourth Circuit. *See Martin v. Dana Corp.*, 114 F.3d 421, 1997 WL 313054 (3d Cir. June 12, 1997) (withdrawn from publication at 114 F.3d 421). The panel's decision was vacated by the court *en banc*. *See Martin v. Dana Corp.*, 114 F.3d 421 (3d Cir.), *vacated and rehearing en banc granted*, 114 F.3d 428 (3d Cir.1997). The *en banc* court referred the case back to the original panel to determine whether Martin could initiate arbitration on his own under the CBA at issue. Finding that Martin could not, the panel reversed itself in an unpublished opinion and found that the CBA did not bar Martin's suit. *See Johnson v. Bodine Electric Co.*, 142 F.3d 363, 367 n. 1 (7th Cir.1998); *see also Martin v. Dana Corp.*, 135 F.3d 765 (3d Cir.1997) (table of or-

ders). The panel's subsequent decision did not address the question of whether a CBA grievance provision could ever bar a worker from bringing a federal employment discrimination claim in court. *Johnson*, 142 F.3d at 367 n. 1. Here, employees are required to present their disputes to union officials, including sequentially the steward, the local grievance committee, the general chairman and so forth, who in turn pursue the matter with various levels of management officials. *See* Article 14(A) and (B), *reprinted* at Exhibit A to Declaration of Richard Frey at pp. 105–09. Thus, the perfection of grievances is done through union officials and no provision of the CBA gives an individual employee the right to perfect grievances independently. *Id.*

The view expressed in "*Austin* has not been universally accepted, and for good reason." *Nieves v. Individualized Shirts,* 961 F.Supp. 782, 790 (D.N.J.1997). As the dissenting judge in *Austin* as well as most other courts which have considered the issue have observed: "the Supreme Court did not say in *Gilmer* that it was overruling *Alexander,* nor did the Court even imply that. Instead, the Court clearly implied to the contrary by explicitly distinguishing *Alexander* from *Gilmer.*" *Brisentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519, 523 (11th Cir. 1997) (*citing in support Livadas v. Bradshaw,* 512 U.S. 107, 126 n. 21, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) ("Gilmer emphasized its basic consistency with our unanimous decision in *Alexander; Gilmer* distinguished [*Alexander* ].")). As Judge Posner aptly noted in *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 365 (7th Cir.1997), a "conservative reading of *Gilmer* is that it just pruned some dicta from *Alexander*—and it certainly cannot be taken·to *hold* that collective bargaining agreements can compel the arbitration of statutory rights." Thus, most courts agree that the Court in *Gilmer* simply excised that aspect of *Alexander*'s rationale which reflected untrustworthiness toward the arbitral process and that *Alexander* remains the law of the land. *See also Coleman v. Houston Lighting & Power Co.,* 984 F.Supp. 576, 582–83 (S.D.Tex.1997); *Bynes v. Ahrenkiel Ship Management (U.S.), Inc.,* 944 F.Supp. 485, 487–88 (W.D.La.1996); *Bush v. Carrier Air Conditioning,* 940 F.Supp. 1040 (E.D.Pa1996); *DiPuccio v. United Parcel Service,* 890 F.Supp. 688 (N.D.Ohio 1995); *Griffith v. Keystone Steel & Wire Co.,* 858 F.Supp. 802 (C.D.Ill.1994); *Randolph v. Cooper Industries,* 879 F.Supp. 518 (W.D.Pa. 1994); *Block v. Art Iron, Inc.,* 866 F.Supp. 380 (N.D.Ind.1994); *Claps v. Moliterno Stone Sales, Inc.,* 819 F.Supp. 141 (D.Conn. 1993).

Defendant argues that in light of the bases upon which the *Gilmer* Court distinguished *Alexander,* the facts in this case are more analogous to *Gilmer* and thus the exclusive forum for plaintiffs' claims should be held to be the CBA's arbitration process. It notes that the CBA requires the union and defendant to comply with federal statutory discrimination law and argues that the potential disparity in interest between a union and an employee regarding the prosecution of statutory rights should be viewed as diminished here because employees covered by the CBA may be represented at a System Board hearing by a person of their own choosing. It also points out that the ADA reflects Congress' policy of encouraging arbitration.

Defendant's argument fails to recognize that, as reflected in *Gilmer,* the Court has been unwilling to permit the rights of the majority in the context of collective representation to constitute a waiver of rights statutorily given to members of a minority class as individuals. As Judge Posner aptly noted:

The collective bargaining agreement is the symbol and reality of a majoritarian concept of a worker's rights. An agreement negotiated by the union elected by a majority of the workers in the bargaining unit binds all the members of the unit, whether they are part of the majority or for that matter even members of the union entitled to vote for leaders—they need not be. The statutory rights at issue ... are rights given to members of minority groups because of concern about mistreatment (of which there is a long history in the labor movement, *see, e.g., Steele v. Louisville & Nashville RR,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)) of minorities by majorities. We may assume that the union will not engage in actionable discrimination against minority workers. But we may not assume that it will be highly sensitive to their special needs, which are the interests protected by Title VII and the other discrimination statutes and will seek to vindicate those interests with maximum vigor.

\* \* \* \* \* \*

We are not holding that workers' statutory rights are never arbitrable. They are arbitrable if the worker consents to having them arbitrated.... All we are *holding* is that the union cannot consent *for* the employee by signing a collective bargaining agreement that consigns the enforcement of statutory rights to the union-controlled grievance and arbitration machinery created by the agreement.

*Pryner,* 109 F.3d at 362–63. The United States Court of Appeals for the Eleventh Circuit has reached the same conclusion. *See Brisentine,* 117 F.3d at 526 ("First, the employee must have agreed individually to the contract containing the arbitration clause—the union having agreed for the employee during collective bargaining does not count."); *EEOC v. Board of Governors of State Colleges & Universities,* 957 F.2d 424, 431 n. 11 (7th Cir.), *cert. denied,* 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992) ("[I]t is well-established that unions cannot waive employees' ADEA or Title VII rights through collective bargaining."); *Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 837 (8th Cir.1997) (observing that the majoritarian rights reflected in a CBA cannot bar the statutory civil rights of individuals).

In addition, the CBA in question does not provide the arbitrator or the System Board with general public law authority to resolve statutory claims. Although the CBA does prohibit discrimination by the union and defendant in accordance with applicable federal and state law, the grievance and arbitration procedure nonetheless is limited to issues which arise as a matter of contract. Article 15(A) provides that "[i]n compliance with Section 204, Title 2, of the Railway Labor Act, as amended, there is hereby established a System Board of Adjustment *for the purpose of adjusting and deciding disputes or grievances which may arise under the terms of [the CBA]." Reprinted* at Exhibit A to Frey Declaration at pp. 112. The System Board's jurisdiction is limited to "grievances" and disputes regarding the "interpretation or application of any of the terms of [the CBA]" and does not extend to "proposed changes in . . . working conditions covered by [the CBA] or any amendment thereto." *Id.* at 112–13. The terms of Article 15 thus limit the adjudicatory authority of the System Board to matters arising as a matter of contract. *See also Coleman,* 984 F.Supp. at 584 (noting that *Alexander* recognized the "inherent" limitations of labor arbitrators). The tribunal's expertise remains within these limited confines. *Id.; see also Brisentine,* 117 F.3d at 521.

Moreover, the fact that a CBA provides employees with contractual rights which are similar to or duplicative of certain statutory rights does not establish that the parties have agreed to submit independent statutory disputes to a labor arbitration. *See Coleman,* 984 F.Supp. at 584 (reasoning that where CBA does not protect against retaliation and imposes anti-discrimination provisions on entities or individuals who are not employers, it follows that the CBA is creating separate contractual protections and not incorporating authority to resolve disputes on bases outside the agreement). Nor does the fact that an individual employee can be represented at a System Board hearing by a person of their own choosing expand the authority of the System Board to that of a tribunal which is empowered to act on public laws and subordinate the majoritarian rights to those of the minority individual for reasons which are independent of the CBA. Finally, the ADA's encouragement of alternative dispute resolution hardly is support for the notion that a provision in a CBA mandates the waiver of individual statutory rights.

For the reasons set forth above, defendant's motion to dismiss will be denied.

An appropriate order will follow.

### ORDER OF COURT

AND NOW, this 23rd day of September, 1998, for the reasons set forth in the opinion filed this day, IT IS ORDERED that defendant's motion to dismiss (Document No. 6) be, and the same hereby is, denied.